JOANN WARD, Respondent, v GERTRUDE KOVACS, Appellant.

Second Department, January 17, 1977

*A. Paul Goldblum* for appellant.

*Kramer, Dillof & Tessel (Stanley Tessel, Melvin H. Bern-heimer* and *Daniel Kramer* of counsel), for respondent.

GULOTTA, P. J. This is an appeal from a judgment in a medical malpractice action, against the estate of a doctor, based upon a general jury verdict in the amount of $500,000.

### FACTUAL BACKGROUND

On Thursday, September 12, 1968, plaintiff, a 24-year-old waitress, sustained an almost imperceptible, nonbleeding cut on the middle finger of her right hand, an eighth of an inch in length. It was, in fact, so slight that she did not notice it until the next morning, when she became aware of an irritation caused by her ring rubbing against it while playing tennis. That same Friday afternoon her finger began to redden and to swell, and so, at about 4:00 P.M., she went to the office of Dr. Kovacs, which was located some five blocks from her Fire Island residence. She testified that the doctor saw her for a maximum of 5 or 10 minutes, and that he gave her some penicillin tablets, with instructions to take one every four hours and to keep the finger wrapped in a cold compress.

The doctor had previously testified at an examination before trial that, at this first visit, he had also given her an injection of 600,000 units of penicillin. That deposition was introduced at the trial by the plaintiff as part of her direct case, the doctor having died prior thereto. The plaintiff, in her testimony, which followed the reading of portions of Dr. Kovacs' examination before trial, denied that the doctor had given her any injection.

The plaintiff next testified that at or about 8:00 P.M., on the evening of the same day, she telephoned the doctor and told him that the swelling had increased; that it had spread to her other fingers; that her whole hand was swollen; and that she had severe pain, was feverish, thirsty, dizzy and very frightened. She testified that the doctor told her to go to a named drugstore and that he would prescribe Darvon to alleviate her pain. He further told her that she should go to bed.

On his examination before trial, Dr. Kovacs deposed that he did not remember whether he had been at home at or about

8:00 P.M. on the evening in question; whether he had received any such phone call; and whether, in fact, he had prescribed Darvon. He averred, however, that had he received such a call, he "surely would have told her to come over". The plaintiff testified that he did not instruct her to come to his office.

The following morning, Saturday, September 14, 1968, and at plaintiff's request, two neighbors, Richard Sheldon and his mother, allegedly made a total of four telephone calls to the doctor's office between the hours of 8:30 A.M. and 5:00 P.M., each time speaking to the doctor's wife and asking that the doctor come over to see the plaintiff. The plaintiff had no telephone.

In his deposition, Dr. Kovacs stated that his office had received only one such call; that it had been taken by his wife; that it had been made during office hours; and that he had visited the plaintiff as soon as he completed his office hours, which was about 5:00 P.M. He then observed that her hand presented an extremely fast fulminating streptococcus infection and that the situation was very serious. He therefore had her evacuated, by ambulance and Coast Guard boat, from Fire Island to Southside Hospital on the mainland, and from there to the Hospital for Special Surgery.

It became necessary to amputate the plaintiff's third finger and to partially amputate three other fingers. In addition, the thumb is ankylosed and rigid, and it is fair to say that the whole hand is functionally useless. To condense a rather gruesome story, she has had six operations and various skin grafts since the incident.

The plaintiff alleges malpractice in that the doctor failed: (a) to inject penicillin during the initial visit; (b) to respond to the alleged Friday night telephone call by seeing her personally (electing instead to prescribe for her over the telephone); and (c) to respond earlier to the calls allegedly made by the Sheldons on Saturday morning and afternoon. She claims that each of these omissions constituted a departure from generally accepted medical practice and standards.

The trial brings into focus a number of questions regarding: (1) the court's charge in connection with the alleged injection on Friday afternoon; (2) the exclusion of testimony relating to plaintiff's previous use of LSD; (3) the repeated references to insurance; and (4) whether it was proper to permit the plaintiff to testify to the alleged Friday night telephone conversa-

tion, after she had introduced into evidence a copy of decedent's examination before trial, as an exception to the Dead Man's Statute (CPLR 4519). These questions will be considered *seriatim.*

## I.

### THE COURT'S CHARGE RELATING TO THE ALLEGED INJECTION OF PENICILLIN ON FRIDAY AFTERNOON

The plaintiff's expert testified at the trial that, had the plaintiff received the massive injection on Friday afternoon which Dr. Kovacs referred to in his examination before trial, the condition would not have developed. The defendant's expert, Dr. Inglis, agreed generally with that opinion, although he disputed whether good medical practice at the time (1968), under the observable conditions, would necessarily have dictated such action. He conceded, however, that if Dr. Kovacs said he had given her the injection, it would indicate that good medical practice had required it, although "ordinarily people with scratches on their hands do not get injections of penicillin." He further testified "I don't think most physicians would have even given her an injection."

The trial court's charge on the subject was as follows: "With respect to the claims of both parties, if you believe what the plaintiff has told you and find that Dr. Kovacs did not in fact inject her with 600,000 units of penicillin, you may find that Dr. Kovacs was negligent since *this would be a departure from accepted standards* of practice and treatment and you may find for the plaintiff" (emphasis supplied). The defendant's counsel excepted to that portion of the charge, insisting that it took from the jury the question of what constituted an acceptable standard. While the trial court agreed, it pointed out that both medical experts testified that had the injection been given, the disaster would not have occurred. What the trial court failed to recognize, however, was that this was not the same as stating that it was a departure from acceptable medical standards not to have given it. Moreover, the court did nothing to correct the erroneous impression which the jury must surely have drawn from the charge, i.e., that the "standards" question was foreclosed from further consideration by it. This was error. Whether accepted standards of practice in 1968 required such an injection on the basis of the plaintiff's observable symptoms, upon her first visit to the

doctor, presented a jury question in the light of Dr. Inglis' testimony that most physicians would not have given such an injection under the circumstances.

Where a malpractice action is submitted to a jury on several theories of liability, and where, as here, a general verdict has been rendered, an improper charge on any of the theories upon which the verdict may have been predicated taints the entire verdict and renders a new trial necessary (see *Schreiber v Cestari*, 40 AD2d 1025).

## II.

### THE EXCLUSION OF TESTIMONY CONCERNING LSD

None of the medical experts who testified at the trial could definatively account for the amazing speed with which the infection developed and spread through the plaintiff's hand, nor had they experienced anything like it in their many years of practice. It was the theory of the plaintiff's expert that the infection per se caused a swelling of the tissues which, in the confines of the fingers, caused constriction of the blood vessels, resulting in gangrene, and that the rapid progress of the infection was due to the geometric multiplication of an extremely virulent infecting organism.

On the other hand, the defendant's medical witness, Dr. Inglis, the surgeon who had been in charge of the case from time of the plaintiff's entry into the Hospital for Special Surgery, testified that the spread of the infection in this case could not have been due solely to pressure on the circulatory system because a hand infection ordinarily causes an enormous *increase* in the blood flow to the hand. It appeared to him that the fulmination was unprecedented and that some other factor had to be at work. In this connection, it should be noted that: (1) the plaintiff's hospital record included a notation that "the patient states that she has taken many drugs of which LSD was one"; (2) her own testimony at the trial established that she had abused drugs in the past, having taken amphetamines or "uppers", smoked marijuana "many times", and even taken LSD on two occasions (the last of which was about a month prior to the incident in suit); and (3) a nurse's note in the Southside Hospital record made reference to an open box on the patient's table containing two red pills and three blue pills with pink stripes.

The plaintiff testified that after taking LSD her teeth be-

came cold. Dr. Inglis testified that this could have been either a psychedelic effect or the result of ischemia (a local deficiency of blood, due chiefly to arterial narrowing), and that LSD, being an ergot derivative, is vasoconstrictive, could inhibit the flow of blood to the hand, and could have been a competent producing cause of the gangrene which developed.

Having ruled out the classic causes for the "enormous hand infection", Dr. Inglis testified that he and his colleagues had "made the assumption" that the taking of LSD was "a contributing factor to the hand infection." On cross-examination, however, Dr. Inglis, in effect, contradicted himself by agreeing with plaintiff's counsel, in conclusory fashion, that "LSD's connections with this whole thing [was] speculative", and that he "didn't mean to tell * * * [the] jury, with a reasonable degree of medical certainty * * * [that] this girl lost her hand *because of LSD"* (emphasis supplied).

Nevertheless, on redirect, he testified: "[There are t]wo factors which are involved here. First is that she has an infection in her hand, a streptococcal infection. Ordinarily the infection travels with rapidity up the arms and becomes a systemic infection. This is called erysipelas. It can be fatal but it rarely becomes localized unless it gets caught in a tonsil. But it rarely becomes localized. It tends to spread very rapidly. In the case of a massive streptococcal infection in the hand, usually it simply diffuses itself out and disappears up the arm, lymph nodes and so forth. Something else must interfere with the blood supply to the hand to allow this infection to be uncontrolled and to produce death of the tissues and it is my opinion that some other factor was involved and LSD seems to be the most reasonable conclusion of this. It has to be something else. I have never seen nor are there any reports of digital gangrene such as I have seen in this young lady in just a streptococcal infection. Could be the first one in the history of medicine. I don't think so."

Thus, the specifics of Dr. Inglis' testimony manifested a reasonable medical certainty, whereas his conclusory statements during cross-examination indicated otherwise. Although difficult to reconcile, this apparent inconsistency may have been the product of his lack of experience as a medical witness, and his consequent failure to comprehend the technical meaning of "reasonable medical certainty".

At the close of the defendant's case, the court struck Dr. Inglis' testimony regarding LSD as too speculative to warrant

the jury's consideration. I believe, under the unusual circumstances of this case, and due to the fact that Dr. Inglis' testimony on redirect examination was so specific and so clearly based upon what appears to have been reasonable medical certainty, that it was error to strike that portion of his testimony with respect to the role, if any, which the plaintiff's drug taking, and particularly her taking of LSD, may have played in the disaster which engulfed her.

Dr. Inglis was the treating physician and an outstanding hand surgeon. He had been in charge of the case throughout the plaintiff's hospitalization; had made an intensive study of the case before any involvement in litigation; and had ruled out the classic causes of gangrene only after extensive consultations with surgical colleagues and the pharmacology department of the hospital. His opinion, in accordance with a medical journal article which he had authored, constituted a serious application of special expertise in an effort to explain what he considered to be an unprecedented fulmination of gangrene of the hand. His testimony was sufficiently specific, in fact, to have been admissible had it been accompanied by the magic and ritualistic words that he believed it to be true "with a reasonable degree of medical certainty".

As was stated in *Matter of Miller v National Cabinet Co.* (8 NY2d 277, 282): "The probative force of an opinion is not to be defeated by semantics if it is reasonably apparent that the doctor intends to signify a probability supported by some rational basis." Medical opinions which have been stated merely to be "possible" or "probable" have heretofore been sustained where there was a reasonable basis in fact for permitting them (see *McGrath v Irving,* 24 AD2d 236, mot for lv to app den 17 NY2d 419), and, as Chief Judge DESMOND observed in *Matter of Ernest v Boggs Lake Estates* (12 NY2d 414, 416), "[o]ur function is not to reject opinion evidence because nonlawyer witnesses fail to use the words preferred by lawyers and Judges but to determine whether the whole record exhibits * * * substantial evidence" (see, also, Richardson, Evidence [Prince, 10th ed], § 371).

In my opinion, Dr. Inglis' testimony fits into this mold.

I further believe that since this case presents a novel medical question, wide latitude is justified, although I do not hereby intend to approve the expression, at trial, of rash speculation or surmise by a medical expert, or indeed by any expert who is called upon to testify.

## III.

### THE REFERENCES TO INSURANCE

Richard Sheldon, the plaintiff's witness, made four references to insurance during his testimony. First, during his direct examination, in the following colloquy:

"Q. Now, did a time come when an investigator representing the defense came to see you?

"A. You asked me for a yes or no answer, but I must tell you something. The first time I don't know who it was that came. The second time I know it was *an insurance person*" (emphasis supplied);

and then, on redirect, in the following testimony:

"Q. At the risk of being an ungrateful person because you have come here to help my client, you didn't want to get involved, isn't that what it was?

"A. No. I want to get involved in—

"Q. You are involved now.

"A. I don't run away from things. But that's why *the insurance man* had difficulty in getting statements from a lot of people. He might have gotten other statements, but a lot of people just don't want—

"Q. This is all hearsay—I'm sorry, let's have the jury decide this case on the evidence and I would like to ask you this: here is a man representing Dr. Kovacs' interests, an investigator, who comes to see you and who you tell us writes some stuff down and asks you to sign it; am I right so far?

"A. Yes.

"Q. You say you didn't want to sign it because Dr. Kovacs was very well thought of in the community out there on Fire Island and you did not want to be—correct me if I am wrong —the bete noir, you didn't want to be the one putting the finger on him, is that what it comes down to?

"A. In a sense, that is really the raw—

"Q. Okay.

"A. Well,—

"Q. I'm sorry. If that leaves it in a manner that isn't the way you'd like it, add anything you like.

"A. It just strikes me the wrong way, but it's basically what it is.

"THE COURT: He said he didn't want to get involved.

"Q. What made you change your mind and decide to get involved in this case; what's in it for you?

"A. There is nothing.

"Q. Is it that justice be done in this case?

"A. That is all. Frankly, *the insurance company* is the one— I am the one that pays the bill for *the insurance company,* if there is one, because it's all of our premiums that pay for it.

"[Plaintiff's counsel]: I ask that that be stricken and the jury be instructed to disregard it.

"THE COURT: Yes. Please strike that from the record. The jury is to disregard the answer" (emphasis supplied).

At the close of this testimony, the defendant moved, *in camera,* for a mistrial. The motion was denied by the trial court with the following statement: "That would have been good ten, fifteen years ago, but not anymore today." This, too, was error.

The plaintiff argues that a witness' unexpected reference to the fact of insurance does not necessarily require a mistrial, and that the trial court may employ its discretion to correct the evil by instructing the jury to disregard it (citing *Goodman v Guida,* 150 Misc 677). In extenuation, the plaintiff also relies on the innocence of her counsel in eliciting such testimony. Be that as it may, innocence of the cause is not enough; there still must be an inquiry into the effect of the reference, i.e., whether the trial court's admonition to disregard it was a sufficient response.

I believe that the witness' philosophical soliloquy as to who "pays the bill for the insurance company", coming, as it did, after his identification of the investigator as "an insurance person", was so specific, analytic and picturesque that its effect on the jury could not have been obviated by the trial court's perfunctory admonition. I take judicial notice of the fact that this trial was conducted in January, 1976, during a time of abundant adverse publicity regarding the medical malpractice insurance companies, and that it was, therefore, more important than ever that no such extrinsic and prejudicial concerns be called to the jury's attention. In short, the jurors should not have been permitted to deliberate with the concept thrust upon them that it would be an insurance company which would pay the judgment, and with the "noble" thought that perhaps ultimately, it would be they, themselves, as members of the public, who would have to pay the bill for

the damages which they might award. Since I cannot say that "it clearly appears that [this factor] * * * could not have influenced the verdict" (see *Simpson v Foundation Co.,* 201 NY 479, 490), I am constrained to hold that the trial court should have granted the motion for a mistrial.

## IV.

### EVIDENCE AS TO THE ALLEGED FRIDAY NIGHT TELEPHONE CONVERSATION AS VIOLATIVE OF CPLR 4519

The last, and perhaps most interesting, of defendant's four arguments is that addressed to the alleged impropriety of permitting the plaintiff to testify to the Friday night telephone conversation which she allegedly had with Dr. Kovacs. It is asserted that such testimony was barred by the so-called Dead Man's Statute (CPLR 4519).

On appeal, it is the defendant's contention that the foregoing constituted inadmissible testimony by an interested witness as to a "personal transaction or communication" with a decedent, and that it did not fall within the statutory exception as testimony offered, in effect, to rebut the admission of prior testimony of the deceased person concerning the same transaction or communication (see CPLR 4519; 5 Weinstein-Korn-Miller, NY Civ Prac, par 4519.23), since the decedent's examination before trial was offered into evidence by the plaintiff herself, as part of her direct case, and not by or on behalf of the decedent's estate.

It was stipulated at the trial that, despite CPLR 4519, the plaintiff would be permitted to testify "as to the treatment she received from the deceased doctor and * * * any conversations she had with him", but that the defendant would be granted a continuing objection to such line of inquiry, with her right to appeal on this issue preserved. The defendant contends that it is implicit in the statutory scheme that the exception applies only where the initiative for the introduction of such testimony lies with the decedent's representative, and that the method of introduction adopted by plaintiff constituted an unauthorized "boot strap" operation.

Substantively, it will be remembered that one of the grounds of malpractice asserted at the trial was Dr. Kovacs' alleged failure to respond properly to the plaintiff's telephone call on Friday evening, September 13, 1968. Procedurally, the plaintiff's counsel was permitted to read a portion of the

doctor's deposition into evidence in which he denied having received such a call, and the plaintiff was thereafter permitted to testify to: (1) the "fact" of the call; (2) the specific and graphic information which she gave to the doctor at that time; and (3) his limited response.

CPLR 4519 provides, in pertinent part, that: "Upon the trial of an action * * * a party or a person interested in the event * * * shall not be examined as a witness in his own behalf or interest * * * against the executor, administrator or survivor of a deceased person * * * concerning a personal transaction or communication between the witness and the deceased person * * * except where the executor, administrator, survivor * * * or person so deriving title or interest is examined in his own behalf, *or the testimony of the lunatic or deceased person is given in evidence,* concerning the same transaction or communication" (emphasis supplied). Thus, the language of the statute, if read literally, would appear to permit testimony by the surviving adverse party as to the particular transaction or communication, so long as the deceased's deposition has been "given in evidence" at the trial by *any* party. Nevertheless, and perhaps because of the juxtaposition of the words preceding the first conjunctive "or" italicized above, it has heretofore been argued that the exception permitting the survivor to testify is based upon waiver (see *Foro v Doetsch,* 39 AD2d 150, 158 [concurring opn of GREENBLOTT, J.], affd 33 NY2d 767; see, also, *Miller v Adkins,* 9 Hun 9), and that the decedent's estate must take the initiative to "open the door" before such testimony may be received (see 5 Weinstein-Korn-Miller, NY Civ Prac, par 4519.23).

Since the statute does not limit the exception *in haec verba* to those cases in which the deceased's representative has introduced the deposition into evidence, the question to be determined is whether such qualification should be read into the statute by implication.

Historically, it may be true that the original intent of the distant predecessor statute (Code of Pro of 1848 [Field Code], § 399) was to severely limit those circumstances in which an interested survivor could testify to a conversation with a deceased, for at common law, and until remedial legislation was passed in the mid-nineteenth century, all interested parties were barred from testifying at a trial (2 Wigmore, Evidence [3d ed], § 576). It is not surprising, therefore, that *Miller v Adkins (supra),* decided in 1876, would set forth a restrictive

interpretation. At the present time, however, the rule with respect to survivor disqualification represents one of the last remaining splinters of incompetency retained in our jurisprudence (see 5 Weinstein-Korn-Miller, NY Civ Prac, par 4519.02), and has become a recurring source of controversy.

Thus, as the Advisory Committee on Practice and Procedure of the Temporary Commission of the Courts stated in its report to the Legislature (2 NY Adv Comm Rep 268 *et seq.)* "[the rule] had created enormous difficulty in litigation and has been condemned as unfair in operation and unsound in principle by every modern student of the law of evidence." McCormick, for example, has criticized it as follows (McCormick, Evidence [2d ed], § 65, pp 142-143):

"By far the most drastic of the common law rules of incompetency was the rule that excluded the testimony of the parties to the lawsuit and of all persons having a direct pecuniary or proprietary interest in the outcome. In effect, this rule imposed a disability upon the party to testify in his own behalf and conferred upon him a privilege not to be used as a witness against himself by the adversary. The disability had the specious justification of preventing self-interested perjury; the privilege had not even a specious excuse. It is almost unbelievable that the rule could have continued in force in England until the middle of the 19th century, and in this country for a few decades longer. In England, the reform was sweeping, and no shred of disqualfication in civil cases remains.

"In this country, however, a compromise was forced upon the reformers. The objection was raised that in controversies over contracts or other transactions where one party to the transaction had died and the other survived, hardship and fraud would result if the surviving parties or interested persons were permitted to testify to the transactions. The survivor could testify though the adverse party's lips would be sealed in death. This is a seductive argument. It was accepted in nearly all the early statutes, at a time when the real dispute was whether the general disqualification should be abolished or retained, and the concession for survivors' cases undoubtedly seemed a minor one. But the concession has now become so ingrained a part of judicial and professional habits of thinking that it is hard to dislodge by argument * * *

"Most commentators agree that the expedient of refusing to listen to the survivor is, in the words of Bentham, a 'blind and

brainless' technique. In seeking to avoid injustice to one side, the statute-makers have ignored the equal possibility of creating injustice to the other. The temptation to the survivor to fabricate a claim or defense is obvious enough, so obvious indeed that any jury will realize that his story must be cautiously heard. A searching cross-examination will usually, in case of fraud, reveal discrepancies inherent in the 'tangled web' of deception. In any event, the survivor's disqualification is more likely to balk the honest than the dishonest survivor. One who would not balk at perjury will hardly hesitate at suborning a third person, who would not be disqualified, to swear to the false story."

Professor Wigmore agrees, stating: "As a matter of policy, this survival of a part of the now discarded interest-qualification is deplorable in every respect; for it is based on a fallacious and exploded principle, it leads to as much or more false decision than it prevents, and it encumbers the profession with a profuse mass of barren quibbles over the interpretation of mere words" (2 Wigmore, Evidence [3d ed], § 578, p 697).

In accordance with the foregoing authorities, I do not believe that CPLR 4519 should be expanded by implication.

Whatever merit the rule of survivor disqualification may still have in our law, it must be grounded, ultimately, on the concept that where death has sealed the lips of one of the parties to a personal transaction, the law, for the protection of his estate and his survivors, should and ought to seal the lips of anyone else making a claim against the estate (5 Weinstein-Korn-Miller, NY Civ Prac, par 4519.03). That rationale can only be marginally applicable to the facts at bar, however, where the decedent has stated his version of the incident for the record, under oath and in an adversary context, and thereafter died. Under such circumstances, the fact that he cannot subsequently rebut, by live testimony, any contrary version as testified to at the trial, is unfortunate, and is a proper subject of discussion both during summation and in the charge, but it does not appear to be a sufficient independent ground to require the exclusion of such testimony *in toto.*

It is not open to question that counsel for the decedent could have offered the doctor's deposition as primary evidence of the facts contained therein, despite the fact that he was no longer available for cross-examination before the jury. Under the facts of this case, however, the surviving adverse party,

whose testimony contradicted that deposition, *was* available for cross-examination at the trial, and therefore subject to the jury's scrutiny. I believe that there is at least as much of a safeguard for truth in the latter situation as in the former (see, generally, Ann., 158 ALR 306).

There is, however, a more fundamental principle at stake. The purpose of a trial is to search for the truth; it is not supposed to be a contest of strategies. Where a party has died after his deposition has been taken, we should not encourage a situation where counsel for the decedent is placed in the position of being able to determine whether it is better for his client that the deposition be admitted into evidence, thus "opening the door" to "survivor" testimony, or whether it is perhaps wiser to withhold it, and thus leave the "door" closed. His decision under such circumstances will be made in his role as an advocate, and not as a disinterested "officer of the court", searching for the truth of the matter wherever it may lie. Absent specific statutory proscription, it should be the court, and not the advocate, which makes this decision, and in view of the protective ambience surrounding an examination before trial, it is my opinion that the "balance" is heavily weighted in favor of (1) disclosure and (2) the admissibility of "survivor" testimony.

I therefore hold that the Trial Term properly permitted the plaintiff to testify to the alleged Friday night telephone conversation.

### CONCLUSION

Upon the whole case, and in view of the substantial errors present herein, the judgment must be reversed and the case remanded for a new trial in accordance with this opinion.

HOPKINS and HAWKINS, JJ., concur with GULOTTA, P. J.; SHAPIRO, J., concurs in the result, with the following memorandum, in which LATHAM, J., concurs: I concur in the result, but I do not agree with the conclusion of my learned Presiding Justice that the Friday telephone conversation was admissible. In spite of the cited textwriters, we should not by indirection do what, in my opinion, CPLR 4519 forbids. If that section represents a "survival of a part of the now discarded interest-qualification [which] is deplorable in every respect" (2 Wigmore, Evidence [3d ed], § 578, p 697), it is for the Legislature to repeal it and not for us to judicially legislate it out of

existence. In my opinion the plaintiff could not, by offering in evidence the examination before trial of the deceased doctor in which he denied recollection of any telephone conversation with the plaintiff on the day in question, constitute that offer as a waiver of the Dead Man's Statute by the defendant so as to permit her to testify to the contents of such a conversation and thus make out a cause of action.

Judgment of the Supreme Court, Suffolk County, entered February 3, 1976, reversed, on the law, and new trial granted, with costs to abide the event.