*Chem. De Venezuela, C.A. v Schenectady Chems.,* 43 AD2d 881, 882).

Although not mentioned by either side, we note that the recent decision of the Court of Appeals in *Matter of Charles v Diamond* (41 NY2d 318), modifying the decision of the Appellate Division, Fourth Department (47 AD2d 426) by directing that the plaintiff's claim for money damages should be dismissed, is inapposite. What was there involved was a damage claim based upon alleged consequential damages to undeveloped land. It was based upon a tort claim arising from actions taken by the local governing municipality in the exercise of its police powers under compulsion of the State. Here, the claim is for damages based upon the imposition of additional charges which involve the unequal assessment of charges for garbage collection without a reasonable basis therefor, resulting in an inequitable allocation of the costs to the village of providing its residents with garbage collection and disposal services among various classes of residential property owners. We find nothing in the decision of the Court of Appeals in *Matter of Charles v Diamond (supra)* which would bar recovery by the plaintiff here of the improperly assessed additional payments which the defendant required it to make to its garbage removal contractors.

The judgment appealed from should therefore be affirmed.

RABIN, Acting P. J., TITONE and O'CONNOR, JJ., concur.

Judgment of the Supreme Court, Nassau County, entered May 12, 1976, affirmed, without costs or disbursements.

EDITH FERRARA, Appellant, v HARVEY R. LEVENTHAL et al., Respondents, et al., Defendants. (And Third- And Fourth-Party Actions.)

Second Department, April 4, 1977

*Demov, Morris, Levin & Shein (A. David Benjamin, Max Toberoff* and *Eugene J. Morris* of counsel), for appellant.

*Morris, Duffy, Ivone & Jensen (William F. McNulty* and *Anthony J. McNulty* of counsel), for Harvey R. Leventhal, respondent.

*William Gitelman, County Attorney (Natale C. Tedone* of counsel), for County of Nassau, respondent.

SHAPIRO, J. In an action to recover damages for medical malpractice, plaintiff appeals from a judgment of the Supreme Court, Kings County, entered May 23, 1975, on a jury verdict in favor of the defendants Harvey R. Leventhal and the County of Nassau. We reverse and grant a new trial.

### BACKGROUND OF THE CASE

This is an action based upon the medical malpractice of Dr. Harvey R. Leventhal, a neurosurgeon, and Nassau County, the owner and operator of the Nassau County Medical Center (also known as Meadowbrook Hospital) for failing to diagnose and treat plaintiff's unruptured intracranial aneurysm with the result that it subsequently ruptured and caused serious brain damage.

The record consists of 10,709 typewritten pages, representing the trial transcript, plus a voluminous number of exhibits. While no weight of the evidence question is here involved, we

nevertheless find it necessary to review the essential facts to show why a new trial is required.

On January 12, 1972 the plaintiff, who was then 41 years of age, was admitted to Doctor's Hospital in Staten Island complaining of "intractable" headaches. They had been present for two months and involved the area of the right forehead and eye. Although the plaintiff had a past history of sinus trouble, she had never experienced this kind of headache before October and November, 1971. Because the X rays taken at Doctor's Hospital indicated a clotting or obstruction in the right maxillary sinus, Dr. Gordon, the plaintiff's treating physician, performed sinus surgery. However, when her headaches and eye pain continued after the operation, Dr. Gordon brought in the defendant, Dr. Leventhal, as a neurological consultant.

Neurological examinations by Dr. Leventhal, which included X rays of the skull and an EEG, failed to show any intracranial pathology. In Dr. Leventhal's opinion, the plaintiff's pain over the right eye was due to the sinus operation and was to be expected.

On January 20, 1972 the plaintiff was discharged from Doctor's Hospital. Two weeks later the plaintiff called Dr. Leventhal to complain of continuing headaches on the right side of her forehead and pain in her right eye. Without seeing her again, Dr. Leventhal arranged for her admission, on February 18, 1972, to St. Vincent's Medical Center in Staten Island where he was a member of the hospital staff, so that he could perform a pneumonencephalogram (PEG) to investigate the possibility of a brain tumor.

The plaintiff entered the hospital on February 18, as arranged for by Dr. Leventhal, but was discharged the next day without the PEG having been performed due to the fact that it was a three-day Washington's Birthday weekend and no work could be accomplished.

On February 28, 1972 the plaintiff was readmitted to St. Vincent's, where she remained until March 4, 1972. The hospital record revealed that, in addition to her previous complaints of headaches on the right side of her forehead and of pain in her right eye, she had recently developed diplopia (double vision) and ptosis (dropping of the upper eyelid) of her right eye.

During this admission the plaintiff was subjected to four neurological examinations, each performed by a different doc-

tor on the hospital staff; two were performed on February 28 and two on February 29. All four doctors made virtually the same findings: Diplopia on upward gaze, ptosis of the right eye, dilated right pupil, and sluggish reaction to light in the right eye. Three of the doctors made a diagnosis of involvement or paralysis of the third cranial nerve. One, as his primary consideration, recommended that an aneurysm be "ruled out" (meaning that something should be done to determine whether that condition existed). Another doctor made a diagnosis of "partial third nerve paralysis secondary to aneurysm".

During her stay at St. Vincent's the plaintiff was given virtually every test designed to detect an intracranial lesion, including X rays, an EEG, a PEG, and a special tap, but all were negative. However, an angiogram, or arteriogram, the only test which could reveal an intracranial aneurysm, was not performed.

Dr. Leventhal explained that he did not perform an angiogram because he had performed four thorough and complete neurological examinations of the plaintiff during this time and they failed to reveal a single neurological abnormality. However, he admitted that there was no record of any of those examinations in the hospital chart. Dr. Leventhal also admitted that proper and accepted standards of medical practice, and the rules of the hospital, required the recordation of such tests in the hospital chart.

On March 4, 1972 the plaintiff was discharged from St. Vincent's Hospital. On March 8, 1972, while the plaintiff was at the home of her sister (Mrs. Blythe), she suddenly started screaming: "my head", and then became unconscious for several minutes. She was taken by ambulance to the emergency room at Meadowbrook Hospital, where she was treated by Dr. Monkowski, who was then a first-year resident. Although Dr. Monkowski was given a history of the plaintiff's case, including her treatment by Dr. Leventhal, he refused to admit her to Meadowbrook. Rather, he suggested to Mrs. Blythe that she take the plaintiff to "see her own doctor", viz., Dr. Leventhal. An effort to reach Dr. Leventhal by phone was unsuccessful. Dr. Monkowski, after taking down the plaintiff's medical history, had an EKG performed, but could find no organic basis for the plaintiff's complaints and attributed her condition to her high emotional state.

On March 9, the next day, Mrs. Blythe reached Dr. Leven-

thal by telephone; he asked her whether the plaintiff had gone to see an eye doctor, as he had previously instructed her to do. When Mrs. Blythe told him that an appointment had been made for Saturday, March 11, he replied that he would see the plaintiff after that appointment was kept.

After the plaintiff kept the appointment with the eye doctor (Dr. Pirundini), Mrs. Blythe tried twice the following Monday to reach Dr. Leventhal by telephone, but was unsuccessful. He did not return her calls. Over the weekend, the plaintiff's condition had been worsening.

On March 14 the plaintiff was admitted to Columbia Presbyterian Hospital, where she later came under the treatment of Dr. Lawrence Poole, the director of neurosurgery at the hospital's Neurological Institute. After an angiogram was taken, Dr. Poole diagnosed her condition as a "ruptured aneurysm of the right internal carotid artery at the posterior communicating junction." The plaintiff's brain damage was so severe that the aneurysm was rendered inoperable. Dr. Leventhal claimed that the aneurysm was inoperable because of its size and position and that he could not prevent its rupture while he treated her at St. Vincent's.

The record of Columbia Presbyterian does not exactly indicate what caused the aneurysm to rupture. However, Dr. Leventhal testified that the aneurysm may very well have ruptured when the angiogram at Columbia Presbyterian was given, due to the injection of the foreign angiographic dye into the artery which was already damaged by the aneurysm at the time the angiogram was performed. This, he said, was one of the dangers involved in doing an angiogram on a patient who is suspected of having an intracranial aneurysm, because it is "the riskiest procedure that we can do" and that it is the very last thing that a physician should ever consider doing because it is fraught with danger.

After approximately 10 months of hospitalization at Columbia Presbyterian and St. Barnabas, the plaintiff was discharged. She was then severely and permanently incapacitated and in need of custodial care 24 hours a day.

As is not unusual, both sides produced expert medical testimony to show that Dr. Leventhal's failure to give an angiogram, and his course of treatment in general, either was, or was not, a departure from accepted medical practice. Thus, the sharp conflict between the opinions of the experts presented a classic question of fact for the jury, whose finding we

would not disturb were it not for a fundamental error made by the Trial Justice in his charge on the subject of contributory negligence.

## THE CHARGE

The court instructed the jury as follows:

"Now, of course, the plaintiff was required to exercise reasonable care for her own safety, and I am referring now, if you believe the testimony, that on March 8 she was referred back to see her own doctor. Whether she was negligent or not in not doing so, or whether the phone call that tried to reach Dr. Leventhal was or was not satisfactory, you will determine.

"But if you find there was any negligence on the plaintiff's part in not complying with that direction, if you believe the direction to have been given, the law requires that the plaintiff act as a reasonably prudent person would under the circumstances.

"The law does not permit you to weigh the degree of fault of the plaintiff and the defendant. It requires that if you find that this constitutes some act of contributory negligence on the part of the plaintiff, then your verdict must be for the defendants, even though you find the defendants to be negligent."

## THE LAW

In *Heller v Medine* (50 AD2d 831) the plaintiff had been discharged from a hospital after uneventful surgery for a cataract in the right eye. She continued under the postoperative care and treatment of the defendant, her surgeon. During the course of eight postoperative visits (from November 21 to December 20, 1967) she complained of an itching sensation in the eye. It was ultimately diagnosed as a viral condition which failed to respond to the prescribed medication. She next appeared at the defendant's office on January 12, 1968, having failed to follow his instructions and to keep appointments on January 5 and 8, 1968. The plaintiff brought the action claiming, *inter alia,* that the prescribed medication had been contraindicated.

The trial court, in its charge (p 831), instructed the jury that, in order for the plaintiff to recover, she must establish that she was "not contributorily negligent by reason of either failure to follow the doctor's instructions or to keep appoint-

ments." In holding this charge to be error, we stated (p 832): "A patient's failure to follow instructions does not defeat an action for malpractice where the alleged improper professional treatment occurred prior to the patient's own negligence. Under such circumstances, damages are reduced to the degree that the plaintiff's negligence increased the extent of the injury *(Morse v Rapkin,* 24 AD2d 24, 25; 45 NY Jur, Physicians and Surgeons, § 171). The error is so prejudicial that reversal would be required in the interest of justice even if plaintiff had not timely excepted".

And, in *Dunn v Catholic Med. Center of Brooklyn & Queens* (55 AD2d 597), we held that it was error for the court not to have charged the jury, as requested by the defendant doctor, that a patient's failure to follow instructions subsequent to an act of malpractice should be considered in mitigation of damages. In that case we affirmed the findings of fact as to liability, but granted a new trial as to the issue of damages since the "error is so prejudicial that reversal would be required in the interests of justice even if appellant had not timely excepted (see *Heller v Medine,* 50 AD2d 831; *Quinones v Public Administrator of County of Kings,* 49 AD2d 889)."

Similarly, in *Quinones v Public Administrator of County of Kings* (49 AD2d 889), the plaintiff, subsequent to the alleged act of malpractice, either failed to come back to, or keep an appointment with, the doctor. In its charge the court stated (pp 889-890): "But, if you find that the plaintiff was negligent, then your verdict will be for the defendant even though you find the defendant was also negligent."

In reversing, we held *(supra,* p 890): "Under this charge, the jury could have found defendant's physicians negligent in their treatment of plaintiff in April, 1964, but nevertheless have rendered a verdict in defendant's favor because it found plaintiff negligent in not returning to the hospital in late June, 1964. A patient's failure to follow instructions does not defeat an action for malpractice where the alleged improper professional treatment occurred prior to the patient's own negligence. Under such circumstances, damages are reduced to the degree that the plaintiff's negligence increased the extent of the injury *(Morse v Rapkin,* 24 AD2d 24, 25; 45 NY Jur, Physicians & Surgeons, § 171). The error is so prejudicial that reversal would be required in the interests of justice even if plaintiff had not timely excepted".

The brief of defendant Leventhal attempts to distinguish

the crushing effect of those cases as follows: "It is submitted that the *Heller* and *Dunn* cases are readily distinguishable from the case at bar on their facts and that the holding in neither of these cases can have any application whatever * * * where the negligence on the part of Dr. Leventhal complained of by the plaintiff was *continuing* negligence which started at the time that he first started to treat the plaintiff and continued right down to March 14, 1972, the date when plaintiff entered Columbia Presbyterian Hospital." (Emphasis supplied.) Thus, he argues that: "[T]he contributory negligence of the plaintiff herself in not carrying out the instructions she had received from Dr. Monkowski on March 8, 1972, to 'go back and see her own doctor' would not be 'subsequent' to the claimed negligence of Dr. Leventhal, which was the situation presented in the *Heller* case, but would be *contemporaneous* with the *continuing* negligence with which Dr. Leventhal is charged in his treatment of the plaintiff." (Emphasis supplied.)

In addition, the said defendant argues that any "technical error" in the charge as to contributory negligence would not, based on the record as a whole, be so prejudicial to the plaintiff's case as to warrant a new trial because it is difficult to believe that, in view of the lengthy medical proof, the plaintiff's contributory negligence "played a significant role in the jury's unanimous verdict in favor of Dr. Leventhal."

It is submitted that the doctrine of the *Heller* case (50 AD2d 831, *supra)* applies with full force to the case at bar. The defendant's attempt to distinguish it on the ground that here there was "continuing" negligence, as opposed to "prior" negligence, should be given short shrift. The fact that there were additional or subsequent acts of malpractice after the plaintiff's alleged contributory negligence should enhance and not serve to defeat her right to recover, for after the alleged acts of malpractice committed prior to March 8, Dr. Leventhal had additional opportunities to possibly correct any misdiagnosis or mistreatment resulting from his previous acts. In addition, were there no acts of malpractice committed subsequent to March 8, there were sufficient such *prior* acts established by the record, or at least a jury on a proper charge could have so found. That Dr. Leventhal had subsequent opportunities to treat the plaintiff cannot obliterate the fact that there were several prior acts of alleged malpractice. Thus, the court's charge on contributory negligence was

clearly erroneous and we cannot accept the defendant Leventhal's contention that telling a jury that its "verdict must be for the defendants even though you find the defendants to be negligent", was a mere "technical error" which did not play "a significant role in the jury's unanimous verdict in favor of Dr. Leventhal", for as we said in *Ward v Kovacs* (55 AD2d 391, 395): "Where a malpractice action is submitted to a jury on several theories of liability * * * an improper charge on any of the theories upon which the verdict may have been predicated taints the entire verdict and renders a new trial necessary (see *Schreiber v Cestari*, 40 AD2d 1025)."

In view of our stated conclusion, we do not deem it necessary to refer to the other points discussed in the briefs of the parties. We do, however, state our expectation that, upon the retrial of this action, counsel for the parties will conduct themselves with more courtesy toward each other and toward the court and in a manner which will not tend to bring themselves or the administration of justice into disrepute. The judgment appealed from should be reversed and a new trial granted,* with costs to abide the event.

DAMIANI, Acting P. J., HAWKINS and O'CONNOR, JJ., concur.

Judgment of the Supreme Court, Kings County, entered May 23, 1975, reversed, on the law and in the interest of justice, and new trial granted as to all parties and causes (except as against St. Vincent's Medical Center, as defendant and third-party defendant, Anthony P. Pirundini, as defendant, and Alfred M. Monkowski, as fourth-party defendant), with costs to abide the event.

---

* We note that the plaintiff's complaint had been discontinued as against St. Vincent's Medical Center and Anthony P. Pirundini, that the County of Nassau's third-party complaint had been discontinued as against St. Vincent's Medical Center and that Harvey R. Leventhal's fourth-party complaint had been discontinued as against Alfred M. Monkowski. Accordingly, those claims are not to be included in the new trial. However, the plaintiff, the third-party plaintiff and the fourth-party plaintiff may, if they be so advised, move at Trial Term to be relieved of their respective discontinuances.