548 A.2d 172

Jonathan CHUDSON and Frances Spielman, Personal Representatives of the Estate of Rhoda Tzemach, et al.

v.

Jessica RATRA.

No. 114, Sept. Term, 1988.

Court of Special Appeals of Maryland.

Oct. 10, 1988.

**754**

Patricia P. Richardson (Martin H. Freeman and Freeman & Richardson, P.A., on the brief) Bethesda, for appellants.

Albert D. Brault (M. Kathleen Parker and Brault, Graham, Scott & Brault, on the brief) Rockville, for appellee.

Argued before WILNER, ROSALYN B. BELL and POLLITT, JJ.

WILNER, Judge.

Rhoda Tzemach died of breast cancer at the age of 36. Before she died, but after it became evident that the cancer had spread sufficiently to make death from it a probability, Ms. Tzemach filed a medical malpractice action against her gynecologist, Jessica Ratra. The basis of her action was that Dr. Ratra negligently failed to diagnose the cancer, to recommend or take appropriate action after Ms. Tzemach reported a lump in her breast, and to inform Ms. Tzemach of the risks of non-intervention.

Following a four-day evidentiary hearing, a health claims arbitration panel concluded that Dr. Ratra was not liable and thus entered an award in her favor. Ms. Tzemach rejected that award and filed a timely action in the Circuit Court for Prince George's County. After trial in that court, the case was submitted to a jury on issues. The jury concluded that Dr. Ratra was indeed negligent in her care and treatment of Ms. Tzemach, but it also found that Ms. Tzemach had been contributorily negligent. Upon that finding, the court entered judgment for Dr. Ratra, and this appeal, by Ms. Tzemach's personal representatives and her surviving daughter, Yael, ensued. No cross-appeal was filed by Dr. Ratra.

The sole issue on appeal is whether the Circuit Court erred in submitting the question of Ms. Tzemach's contributory negligence to the jury. It is evident, from the record before us, that the submission, and the jury's finding, necessarily rested upon evidence that Ms. Tzemach failed to report back to Dr. Ratra, or to seek other medical advice, when she knew, or at least suspected, that the lump she felt in her right breast not only did not disappear, as Dr. Ratra had led her to believe it would, but actually began to grow.

For purposes of this appeal, appellants concede that Ms. Tzemach's delay in seeking medical advice constituted negligence. They argue, however, that that negligence cannot operate to bar recovery in this case because (1) there was legally insufficient evidence that it contributed to the spread of the cancer to the point of incurability and lethality and, (2) in any event, it was not concurrent with Dr. Ratra's primary negligence.

I. General Factual Background Standard Of Review

Some of the important facts bearing on the negligence of both doctor and patient were in dispute. There was disagreement as to the purpose of some of Ms. Tzemach's visits to Dr. Ratra, what was said during those visits, what tests or other procedures were performed by Dr. Ratra, the size of lumps felt by Ms. Tzemach or noted by Dr. Ratra at

various times, and the precise instructions given to Ms. Tzemach by Dr. Ratra during some of the visits. In that regard, we start with the propositions, drawn from a number of cases quoted, cited, and summarized in *Moodie v. Santoni*, 292 Md. 582, 441 A.2d 323 (1982), that:

(1) The burden of proving contributory negligence, including the causal connection between that negligence and the injury sued upon, is on the defendant.

(2) The absence or presence of contributory negligence is generally a question for the jury. If there is any evidence, however slight, legally sufficient as tending to prove contributory negligence, the weight and value of that evidence must be left to the jury. To be legally sufficient, the evidence must be beyond "a mere scintilla of evidence, amounting to no more than surmise, possibility, or conjecture...." *Fowler v. Smith*, 240 Md. 240, 247, 213 A.2d 549 (1965).

(3) It is only when the minds of reasonable persons cannot differ that the court is justified in deciding the question as a matter of law. But before a plaintiff can be held to be free of contributory negligence as a matter of law, "the truth of all the credible evidence tending to sustain the claim of [contributory] negligence must be assumed and all favorable inferences of fact fairly deducible therefrom tending to establish [contributory] negligence drawn." *Id.* at 246, 213 A.2d 549.

It is against these standards that we examine the record.

Ms. Tzemach had a family history of breast cancer, which was a matter of concern to her, and, perhaps as a result, she had learned the technique of breast self-examination. She began seeing Dr. Ratra in 1981 for routine gynecological examinations and for birth control advice and procedures. During those examinations, Dr. Ratra routinely examined Ms. Tzemach's breasts. Until March, 1983, the breast examinations were unremarkable.

In the course of her examination on March 25, 1983, Dr. Ratra said that she discovered "multiple nodularities, small

cysts," about one centimeter in size, in the lower and outer quadrants of Ms. Tzemach's left breast. Aware that Ms. Tzemach was then pre-menstrual, Dr. Ratra concluded that these nodularities represented fibrocystic changes that were common in women.[1] She stated that she explained to Ms. Tzemach the nature of these changes, told her that they should regress after her period, and made sure that Ms. Tzemach was able to feel the cysts and was competent to do self-examinations. Ms. Tzemach said that she could recall no such conversation, or anything out of the ordinary about her breasts.

In August, 1983, Ms. Tzemach said that she felt a hard lump, about the size of a half dollar, in the upper right part of her right breast. She saw Dr. Ratra on September 6.

Once again, there is a dispute as to what occurred during that visit. Ms. Tzemach said that she showed Dr. Ratra the lump, which was different than the other lumps she had felt in that it was "a hard consistency" and "immobile." She stated further that Dr. Ratra aspirated the lump, withdrawing a "bloody fluid," but again told her that the lump was fibrocystic and that she should "keep an eye on it." In accordance with that advice, Ms. Tzemach decided simply to monitor the lump and see "if it changed in any way." Dr. Ratra denied aspirating the lump, claiming that she observed nothing more than a premenstrual cyst in the upper and outer quadrant of the right breast. She testified:

"Again, because it [was] a premenstrual cyst and I have already discussed with her fibrocystic changes I went

---

1. Dr. Ratra explained that fibrocystic changes occur in about 70–75% of women of Ms. Tzemach's age. Prior to the menstrual period, the breast ducts swell up "with the change of the hormones in the cycle," thus causing cysts. Along with the cyst, there may be fibrous tissue, and together they "give the feeling of nodularities." The fluid, and thus the cyst, disappears with the menses, but the fibrous tissue often remains. Much of this was confirmed by another medical expert testifying for Dr. Ratra. Dr. Allen B. Weingold also stated that fibrocystic change was present in about 70% of young women and that, in about 95% of cases, the cysts disappear over the menstrual cycle.

over the same things again. We discussed, we talked and if you see the note, I warned her if the cyst is persistent to call me, having made sure again she felt the same cyst that I felt and she [was] competent enough to examine her breasts."

Dr. Ratra said that, if the cyst persisted beyond Ms. Tzemach's next period, she intended to "get further surgical consult."

Ms. Tzemach continued with her monthly self-examinations. At the end of November, she noticed that the lump seemed to be getting bigger, and so she called Dr. Ratra "immediately" and went for another examination on December 13. Here, too, the evidence differs as to what occurred.

According to Ms. Tzemach, the lump in her right breast was "a hard mass" that was "immediately detectable" and that Dr. Ratra agreed was "getting bigger." Although she was somewhat vague as to the size of coins, Ms. Tzemach estimated that the lump was "larger than a half dollar and perhaps as large as a silver dollar." Dr. Ratra, on the other hand, recorded both breasts as being sensitive and tender but found "no discrete lump." She attributed the sensitivity of the breasts to fibrocystic changes and the fact that they were "engorged" as the result of the menstrual cycle. Whether on her own initiative or at Ms. Tzemach's request —that too is in dispute—Dr. Ratra referred Ms. Tzemach for a mammogram.

Again, according to Dr. Ratra, she made clear to Ms. Tzemach that the absence of a lump "does not mean [she] should stop examining [her] breasts"—that she "should continue with the breast exam" and "[a]ny change noticed any time should be reported to me."

The mammogram was done on December 21 at Prince George's Hospital. It revealed no discrete mass or evidence of malignancy but confirmed fibrocystic changes. Dr. Ratra informed Ms. Tzemach of the results. She said that, in such cases, she informs her patients, and thus inferentially informed Ms. Tzemach, that

"[T]his is not a substitute for breast self-exam. There are some diagnostic errors in this where they can miss a lump. But that does not mean that they can be reassured everything is okay. They must come to me [*sic,* continue?] to examine their breasts. Any change must be reported to me."

Upon giving this advice, Dr. Ratra said that she expected Ms. Tzemach "[t]o continue breast self-exam every month after the period was over" and, if she found anything by way of a change, "to be calling me at once."

Ms. Tzemach denied much of what Dr. Ratra said. She claimed that Dr. Ratra told her that "the results showed normal, nothing to be concerned about" and said nothing about false negatives or continued self-examinations.

Whether or not Dr. Ratra repeated that advice, Ms. Tzemach was aware of the need to continue self-examination and she in fact performed self-examination in January, February, March, April, May, June, and July of 1984.[2] The lump that she felt since September, that she believed had grown in December, never disappeared. "Around April," she said, she "felt some change." It "seemed to be growing further into the breast and into the side of the breast." By July, she "was sure that it was much larger." Indeed, she stated, "By July it was very large and tender, pushing out on the side, to the point that if I was touched on that side I would immediately jump. It was big enough by that

---

2. Ms. Tzemach's deposition testimony on this point is most relevant and illuminating:

"Question: But in this process every month you felt the same lump to see if in your mind it was growing?
Answer: Yes.
Question: Why did you want to see if it was growing?
Answer: To see if there was any change in it.
Question: Why did you want to see if there was a change in it?
Answer: To report it to my doctor.
Question: Why?
Answer: In case there was a chance of any cancerous mass.
Question: What did it mean to you if you discovered it was growing as opposed to staying the same size?
Answer: It meant to me that it was probably cancerous."

time to be felt through my clothes rather than just un-clothed."

Asked to quantify the actual growth, Ms. Tzemach stated that, in July, the lump was the size of an egg; in June, it was about two-thirds the size of an egg; and in May, it was about one-quarter the size of an egg.

It was not until August 6, however, that Ms. Tzemach called Dr. Ratra. Dr. Ratra immediately referred her to a surgeon who promptly performed a biopsy. The biopsy revealed a malignant tumor, causing the surgeon to recommend a radical mastectomy. Subsequent tests conducted by Dr. Marc E. Lippmann, an oncologist, revealed, however, that the cancer had already spread to the liver, and so, on Dr. Lippmann's advice, Ms. Tzemach decided not to proceed with the surgery but embarked instead on a program of aggressive chemotherapy and radiation.

## II.  Issue No. 1—Proximate Cause

### A.  *Nature Of The Claims*

In considering the issues before us, it is important to keep in mind the nature of the claims being made against Dr. Ratra. Appellants have never contended that Dr. Ratra did anything to cause the onset of Ms. Tzemach's cancer; their complaint, rather, has been that Dr. Ratra failed to take appropriate action to diagnose and treat the cancer at a time when the cancer was, or probably was, curable. The injury for which Ms. Tzemach initially sued was the *spread* of the cancer, which caused her to undergo extensive medical treatment and incur great expense, pain, and anguish. Ms. Tzemach died prior to trial and, as a result, (1) her action, for those injuries plus her funeral expenses, was prosecuted by her personal representatives and (2) a wrongful death action was filed by Yael Tzemach, a surviving minor daughter.

Both actions involve, in one form or another, an effort to recover for what is often referred to as "loss of a chance." Yael's claim is that, had Dr. Ratra acted properly, the cancer could have been treated before it reached the point

of *lethality.* By seeking recovery for funeral expenses, the survival action also rests to some extent on that premise, although the principal damages sought in that action did not arise as much from the ultimate lethality of the disease as from its eventual incurability. Most of the injury alleged by Ms. Tzemach and her personal representatives arose from the progression of the disease prior to death and from the efforts made to delay her ultimate demise.

As "loss of chance," of cure in one case and of survival in the other, was the principal focus of the claimed negligence on Dr. Ratra's part, so too it was the focus of the defense of contributory negligence: did Ms. Tzemach's delay in seeking medical advice during the critical period January— August, 1984, contribute either to the incurability or the lethality of the disease? In that regard, appellants urge that Dr. Ratra, who had the burden of proof on the issue, failed to show that the disease had not already reached the incurable or lethal state by January or April, 1984; if the disease had already reached that state by then, they claim, any negligence in seeking medical assistance thereafter would be essentially irrelevant and could not have contributed to the injuries for which recovery is sought.

### B. *Evidence As To Proximate Cause*

Appellants' argument proceeds principally from the testimony of Dr. Lippmann concerning the nature and progression of breast cancer.

Dr. Lippmann described four stages of breast cancer, each stage being determined by one or more of three factors—size of tumor, involvement of lymph nodes, and metastases, i.e., spread of the cancer beyond the breast and lymph nodes. According to Dr. Lippmann, Stage 1 exists when the tumor is less than two centimeters, no lymph nodes are involved, and there is no metastatic disease. Of patients having a Stage 1 breast cancer, approximately 75–80% are cured with proper treatment. Stage 2, he said, occurs when either the tumor is between two and five centimeters or when the tumor is less than two centimeters

but there is nodal involvement. Dr. Lippmann opined that 55–60% of patients with Stage 2 breast cancer can be cured of the disease.

Stage 3, according to Dr. Lippmann, involves either a tumor greater than five centimeters or a more advanced axillary lymph node disease. At that stage, only about 20–25% of patients can be cured of the disease; the balance of the patients (75–80%) die within five years. Finally, Stage 4 exists when the patient has metastatic disease that has spread elsewhere in the body; size of tumor and nodal involvement are irrelevant in that circumstance. Stage 4, said Dr. Lippmann, is not a "curable setting"; the five-year survival rate at that point is not more than one or two percent, and even those patients will eventually die of the disease.

Dr. Lippmann testified further that cancers grow by a process of cell division, or doubling—i.e., "two becomes four cells, four becomes eight cells, eight becomes sixteen cells...." The measurement of that process is called "doubling time"; it "tells you something about how fast on average it is growing." Because Dr. Lippmann had not seen Ms. Tzemach before August, 1984, he had no "direct knowledge of how big her cancer was at any point in time prior to when I saw her" and did not know "how fast her cancer doubling time was directly." He said that breast cancers "have a wide range of growth rates or doubling times" and estimated that "a range of doubling times of approximately 15 days to about 75 days would encompass about 85 or 90 percent of breast cancers in women like [Ms. Tzemach]." That doubling time, Dr. Lippmann made clear, refers to a doubling of the *volume,* not the diameter, of the tumor, the difference being a factor of three. Thus, he said, "[w]hen you double the diameter you have an eight-fold increase in volume" ($2 \times 2 \times 2$), so that, if the doubling time were applied to growth in diameter, the range would be not 15–75 days but three times that, or 45–225 days. Dr. Lippmann indicated that Ms. Tzemach's doubling time was probably at the more rapid end of the range.

## C. *Definition Of The Issue*

The relevance of this evidence as to staging and doubling time hinges on and proceeds from the assumption that, to establish effective contributory negligence, Dr. Ratra was obliged to show that the negligence occurred at a time when there was still a statistical probability of cure. Appellants thus urge that it was incumbent on the defendant to establish that, as of April, 1984, the cancer had not proceeded beyond Stage 2, where the statistical probability of cure was still greater than 50%. Given the wide range of doubling times stated by Dr. Lippmann and the paucity of evidence as to the size of the tumor in September or December, 1983, or during the period January—April, 1984, they argue that any kind of conclusion as to what stage the cancer was in at any of those times would be merely speculative.

This question, as presented, is one of evidentiary sufficiency. No complaint is made in this appeal about the form or language of the court's instructions on contributory negligence; the argument is that the issue itself should have been withdrawn and decided as a matter of law.[3]

---

**3.** The court did not discuss staging or statistical probabilities in its instructions on contributory negligence. Indeed, specific mention of that subject came only in the instructions on Yael's wrongful death action, where the court stated:

"Now, for Yael's claim, in order to recover for wrongful death Yael would have to prove by a preponderance of the evidence that had Dr. Ratra not been negligent Rhoda Tzemach probably would have lived. Again, for contributory negligence the same issue of causation comes up, as you will see. But in other words, what do I mean by Rhoda Tzemach probably would have lived, had Rhoda Tzemach's breast cancer been properly evaluated or diagnosed, that is, it is more probable than not that she would have survived or that she would have had a greater than fifty percent chance of survival had her breast cancer been diagnosed as plaintiffs claim it should have been. So again, if you determine that Dr. Ratra was negligent for the wrongful death action, you would also have to determine whether it is more probable or not whether Rhoda Tzemach had a fifty percent—greater than fifty percent chance of survival had the breast cancer been properly diagnosed as the plaintiffs claim, more probably would have lived. Probabilities exist when there is more evidence in favor of survival than against it. That is, there is

## D. *Discussion*

### (1) Relevant Standard

We are dealing here with what Professor Joseph H. King, Jr. has termed "the destruction of a chance of completely avoiding an adverse result or of achieving a definitive favorable result." King, *Causation, Valuation, And Chance In Personal Injury Torts Involving Preexisting Conditions And Future Consequences*, 90 Yale L.J. 1353, 1365 (1981). Professor King says of this:

"Most courts have misperceived the nature of the interest destroyed by failing to identify the destroyed chance itself as the compensable loss. Instead, they have treated the chance of avoiding the loss as if it were either a certainty or an impossibility, depending on whether, (under the traditional standard of proof) the tortiously reduced likelihood of loss avoidance was better than even. Thus, the plaintiff will recover for a lost opportunity only it is appears more likely than not that but for the tort

---

greater than a fifty percent chance of survival had there not been negligence. That is what we mean by negligence."

The court's general instructions on primary negligence, and those applicable to the survival claim by the personal representatives, stated, in relevant part:

"Dr. Ratra would only be responsible for injuries which were actually caused by her negligence. However, if the negligence caused the aggravation or allowed the spread of cancer, then the plaintiff would be entitled to recover to the extent that the cancer was aggravated, increased, worsened or allowed to spread because of negligence. That same thing will be applicable when we get to contributory negligence.

Keep in mind, when we say negligence, it requires both negligence, failing to meet the standard of care and damages as a result of that negligence. That is, the cancer was allowed to spread, increase or worsened because of the negligence."

The relevant instruction on contributory negligence stated:

"A plaintiff cannot recover for her own injury if she was negligent and her negligence was a cause of that injury. Now, in the suit for wrongful death the plaintiffs cannot recover if the plaintiff decedent in this case, Rhoda Tzemach was herself negligent in causing her own death. As I have already noted, Dr. Ratra has the burden of proving contributory negligence and that that contributory negligence was a cause of injury or death."

some definitive adverse result would have been avoided. His recovery, however, will not be discounted by the chance that the loss might have occurred even absent the tort. Conversely, the plaintiff recovers nothing for the lost chance if the probability of that chance does not rise to the level required by the applicable standard of proof.

The majority of personal injury torts cases that have confronted the question have adopted an all-or-nothing approach to the loss of a chance."

(Footnote omitted.) *Id.*

King goes on in his article to define three different standards of proof that may be applied, the most common being the "preponderance of evidence" or "more likely than not" standard. This standard, he says, "denies compensation for the loss of a not-better-than-even chance of avoiding some adverse result." *Id.* at 1367.

To date, Maryland is one of those States that, according to Professor King, have "misperceived the nature of the interest," for, in common with many States, it has, so far, declined both to recognize "loss of chance" as a discrete injury for which an independent tort action will lie or to allow recovery, even within the traditional framework of negligence/proximate cause for destruction of a chance that is less than "better-than-even." See *Weimer v. Hetrick*, 309 Md. 536, 525 A.2d 643 (1987), *Cooper v. Hartman*, 311 Md. 259, 533 A.2d 1294 (1987) and cases cited therein; also Feldman, *Chances As Protected Interests: Recovery For The Loss Of A Chance And Increased Risk*, 17 U.Balt.L. Rev. 139, 157 (1987); compare Annot., *Medical Malpractice: "Loss Of Chance" Casualty*, 54 A.L.R.4th 10, 30–35 (1987), placing Maryland in the category of States allowing a finding of proximate cause to be supported by testimony that the malpractice "increased the risk for, or diminished the opportunities of the patient," rather than in the group of States requiring evidence that "in the absence of the alleged malpractice, a better result was probable, or more likely than not. . . ." We think that the A.L.R. annotator has misread *Weimer v. Hetrick.*

Messrs. King and Feldman point out some of the anomalies and unfairness in this "all-or-nothing" approach, and indeed there are some. As Judge Soboleff commented, in *dicta*, in *Hicks v. United States*, 368 F.2d 626, 632 (4th Cir.1966):

> "When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass. The law does not in the existing circumstances require the plaintiff to show to a *certainty* that the patient would have lived had she been hospitalized and operated on promptly."

(Emphasis in original). *See also Restatement (Second) of Torts* § 323 (1965); *Thompson v. Sun City Community Hosp., Inc.*, 141 Ariz. 597, 688 P.2d 605 (1984); *Jones v. Montefiore Hospital*, 494 Pa. 410, 431 A.2d 920 (1981); *McKellips v. Saint Francis Hosp., Inc.*, 741 P.2d 467 (Okla. 1987); *DeBurkarte v. Louvar*, 393 N.W.2d 131 (Iowa 1986); *Roberson v. Counselman*, 235 Kan. 1006, 686 P.2d 149 (1984); *Evers v. Dollinger*, 95 N.J. 399, 471 A.2d 405 (1984); *Thornton v. CAMC, Etc.*, 305 S.E.2d 316 (W.Va.1983).

Whether, on balance, a departure from the current Maryland rule is advisable is not a decision we need or should make in this appeal. The case was tried, both as to primary and contributory negligence, on the theory that the party with the burden of proof had to demonstrate that the other's negligence occurred at a time when the cancer was still probably curable, i.e., that there was then a better-than-even chance that had the party not been negligent, the cancer could have been successfully treated. That is the rule we shall apply.

## (2) Proving The Standard

Because, as we indicated, no doctor, other than Dr. Ratra, examined Ms. Tzemach prior to August, 1984, there was no direct medical evidence beyond Dr. Ratra's testimony as to the state of Ms. Tzemach's cancer at any time before then. It was thus a matter of working backward from August, 1984, by inference. The only evidence in that regard came from Dr. Stuart C. Edelberg, one of appellants' expert witnesses. Dr. Edelberg, like Dr. Lippmann, denied any direct knowledge of the specific progression of Ms. Tzemach's cancer. In response to a hypothetical question, he opined that, if Ms. Tzemach in fact had a lump the size of a half dollar in September, 1983, as she claimed, the cancer would have been in Stage 2 at that time. Dr. Edelberg hastened to add, however, that estimations of size by patients are not very reliable and that he questioned the accuracy of Ms. Tzemach's measurement.

This lack of direct evidence as to the specific progression of the cancer left the issue of proximate cause, as to both primary and contributory negligence, to be resolved solely on the basis of statistical probabilities, which is, at best, indirect and, at worst, imprecise and problematic. The fact that, in some universe of women exhibiting symptoms within a certain range, a given percent, with proper treatment, tend to recover and the balance do not says nothing definitive about the prospect for recovery of Ms. Tzemach in particular. This is especially so in light of the range of symptoms falling within each of the four stages and the unclarity, at least in this record, of where within the various stages the universe of women were and the kind of treatment, if any, which was given to them. Dr. Lippmann noted the problem in two respects. First, he made clear that cure depends on treatment: "if you don't treat breast cancer, if you just leave it alone, even Stage 1 disease, everybody dies. Breast cancer untreated is a progressive disease that results in everybody's death." More directly to the point, he said:

"You are acting as though Stage 2 breast cancer is a clean, uniform general box in which a group of patients can be deposited and you want that survival. But as you recall, when I defined Stage 2 it included patients with one centimeter tumors who had positive nodes and it included patients with four centimeter tumors who had no lymph node involved. It included patients who had 2.1 centimeter tumors or 4.9 centimeter tumors. All of these things are real facts that could be known about a case which would give me drastically different estimates. Knowing that you are asking me to put all these different factors in one box and knowing they have very different outcomes, I can give you an average number, *but it is not a meaningful number about a specific patient in whom clear facts are known.*"

(Emphasis added.)

■ Lamentable as the problem is, in a case where more specific evidence is not possible, the courts, whether using the "more probable than not" or some lesser standard, have allowed juries to determine probabilities based directly or indirectly on universal statistics or even on the expert's general experience with other patients. *See, for example, Hamil v. Bashline,* 224 Pa.Super. 407, 307 A.2d 57 (1973), *rev'd on other grounds* 481 Pa. 256, 392 A.2d 1280 (1978); *Anthony v. Hospital Service Dist. No. 1,* 477 So.2d 1180 (La.App.1985), *cert. denied* 480 So.2d 743 (La.1986); *Brown v. Koulizakis,* 229 Va. 524, 331 S.E.2d 440 (1985); *Herskovits v. Group Health Co-op,* 99 Wash.2d 609, 664 P.2d 474 (1983); *Roberson v. Counselman,* 686 P.2d 149; *Sharp v. Kaiser Foundation Health Plan,* 710 P.2d 1153 (Colo.App. 1985); *cf. Evers v. Dollinger,* 471 A.2d 405, *and compare Cornfeldt v. Tongen,* 295 N.W.2d 638, 641 n. 4 (Minn.1980).

In nearly every instance, the relevance and materiality of this kind of evidence is simply assumed, without comment. In part, we suspect, this may be a matter of simple necessity. In most cases, the problem of proof arises in the context of establishing primary, rather than contributory, negligence. The lack of more specific evidence often re-

sults from the failure of the patient to have sought other medical assistance which, in turn, resulted from assurances by the defendant that the plaintiff did not have a condition warranting medical intervention; and thus, if this kind of secondary evidence is not deemed sufficient, there would arise the anomalous and wholly unsatisfactory situation of the defendant's very negligence effectively precluding any recovery. Acceptance of this kind of evidence may also be based upon a tacit recognition that even estimates of probability tailored specifically to a given patient are ultimately derived from generally accepted statistical norms.

For either of these reasons, we think that estimates of probability, as to cure or survival, may be based on universal statistics commonly accepted within the medical community and that estimates so based can support a finding as to proximate cause in terms of both primary and contributory negligence.

### (3) Sufficiency Of Evidence In This Case

■ We come, then, to the "bottom line" question: was there sufficient evidence that Ms. Tzemach still had a better-than-even chance of cure in January—April, 1984, when she knew, or at least suspected, that she had something other than a routine cyst and that whatever she had was growing, to warrant submission of the issue of contributory negligence to the jury? We believe that there was.

Given the paucity of clear, direct evidence as to the onset, size, and progression of Ms. Tzemach's cancer, at least from December, 1983, and even back to September of that year, much was left to inference and hypothesis, as to both primary and contributory negligence. No one could, or did, say for certain at what precise moment Ms. Tzemach moved from Stage 2 to Stage 3. That does not, however, translate into a legal insufficiency of evidence. Although Maryland juries may not engage in empty, overt speculation, they *are* given considerable leeway to draw inferences based on evidence. That, indeed, is the necessary and logical corol-

lary to the rule requiring the submission of even "meager" evidence to the jury.

As we observed initially, on the issue of contributory negligence the evidence and reasonable inferences from it must be viewed in a light most favorable to Dr. Ratra. So viewed, the jury could rationally have reached a number of alternative conclusions fatal to appellants' case. It may, for example, have disbelieved Ms. Tzemach's uncertain testimony that she had a lump the size of a half dollar in September or one "perhaps as large as a silver dollar" in December. Her own expert cast doubt on those estimates. It could, instead, have believed that the cancer did not begin until November or December, that it was still in Stage 1—even early Stage 1—in December, that it grew at a moderate pace thereafter, and that it did not enter Stage 3 until after April, 1984. Such a finding would be consistent with Dr. Ratra's testimony, confirmed by the mammogram, that there was no discrete lump in December; it would also be consistent with a finding that Dr. Ratra's negligence consisted of her failure to recommend a biopsy in December, when the cancer was just beginning and thus had an excellent chance of cure.

Proceeding on this basis, the jury could also have found that Ms. Tzemach's negligence began not in April but in January, when she ascertained that the "cyst" had not disappeared as it should have done if it were truly a cyst, and that her negligence became even more manifest in February, when the lump persisted.

Alternatively, the jury may have believed that the cancer was already at Stage 2 in December as Dr. Edelberg hesitantly surmised but, crediting Ms. Tzemach's testimony that it remained about the same size until April, may have found that the doubling time during that period was slow and that it did not enter Stage 3 until late April or May. It could then have found that Ms. Tzemach's negligence occurred in April, when she first suspected that the lump was growing and yet did nothing.

Under either circumstance, the jury could properly have concluded that, had Ms. Tzemach followed Dr. Ratra's oft-repeated instructions and reported back, there was a better-than-even chance that the cancer could have been cured. For this reason alone, quite apart from whatever occurred in May, June, or July, the evidence sufficed to support the defense of contributory negligence.

### III. Issue No. 2

### Concurrence Of The Negligence

Appellants frame their second complaint as follows: "Because as a matter of law, contributory negligence requires that the patient's negligence be concurrent with the negligence of the physician, and since Rhoda Tzemach's alleged negligence occurred as a result of her physician's negligence and was not concurrent with it, the trial judge committed reversible error in permitting the jury to consider the issue of contributory negligence, and alternatively in failing to instruct the jury as to concurrent negligence."

The notion here is that, for a plaintiff's negligence to be regarded as contributory, and thus a bar to recovery, it must be both independent of and temporally concurrent with the defendant's primary negligence. Ms. Tzemach's negligence, they argue, does not meet that test: it was not concurrent because it did not begin until at least January, whereas Dr. Ratra's negligence occurred, at the latest, in December; and it was not independent of Dr. Ratra's negligence but was instead the direct result of it. Had Dr. Ratra acted properly in December, they contend, "Ms. Tzemach would not have been in the position of failing to seek further follow-up treatment."

There are, to be sure, a number of States that have adopted the view that, to bar recovery in a medical malpractice action, the contributory negligence of the patient must be contemporaneous with the negligence of the doctor, and that a patient's negligent failure to return for further visits or examination following an incorrect diagnosis or mistreat-

ment does not suffice. New York seems to follow that approach, holding in several cases that, "A patient's failure to follow instructions does not defeat an action for malpractice where the alleged improper professional treatment occurred prior to the patient's own negligence. Under such circumstances, damages are reduced to the degree that the plaintiff's negligence increased the extent of the injury." *Quinones v. Public Adm'r of County of Kings,* 49 A.D.2d 889, 373 N.Y.S.2d 224, 226 (1975); *see also Ferrara v. Leventhal,* 56 A.D.2d 490, 392 N.Y.S.2d 920 (1977); *Morse v. Rapkin,* 24 A.D.2d 24, 263 N.Y.S.2d 428 (1965).[4]

This view seems to regard the patient's subsequent negligence as simply exacerbating the damage flowing from the doctor's negligence rather than contributing to the injury caused by that negligence. Other courts have also espoused such a view. *See, for example, Martineau v. Nelson,* 311 Minn. 92, 247 N.W.2d 409 (1976); *Beadle v. Paine,* 46 Or. 424, 80 P. 903 (1905); *Bird v. Pritchard,* 62 O.O.2d 96, 33 Ohio App.2d 31, 291 N.E.2d 769 (1973); *Lawrence v. Wirth,* 226 Va. 408, 309 S.E.2d 315 (1983); *Sanderson v. Moline,* 7 Wash.App. 439, 499 P.2d 1281 (1972); and *cf. Sawka v. Prokopowycz,* 104 Mich.App. 829, 306 N.W.2d 354 (1981).

In some contexts, this may be an entirely correct approach, even where contributory negligence is generally held to be a bar to any recovery. Where the injury flowing from the primary negligence is essentially complete prior, and thus without regard, to any negligence on the part of the patient, and the patient's failure to seek further advice or treatment simply enhances the injury, the distinction

---

**4.** Shortly after *Quinones* was decided, New York enacted a comparative negligence statute incorporating the essence of this line of decisions. N.Y.Civ.Prac.Law § 1411 (Consol.1978). Under § 1411, culpable conduct, including contributory negligence, does not bar recovery but does diminish the amount of damages recoverable by "the proportion which the culpable conduct ... bears to the culpable conduct which caused the damages." See *Suria v. Shiffman,* 67 N.Y.2d 87, 499 N.Y.S.2d 913, 490 N.E.2d 832 (1986), for general discussion of the applicability of § 1411 in a medical malpractice case.

drawn by those cases may be appropriate. *See* 70 C.J.S. *Physicians and Surgeons* § 80(a) (1987): "Where liability for negligence or malpractice has been incurred by a physician, subsequent negligence of the patient, *which aggravates the injury primarily sustained at the hands of the physician,* does not discharge the latter from liability, but only goes in mitigation of damages." (Footnote omitted; emphasis added.)

That, of course, is not the situation here. The injury sued upon here was the spread of the cancer to the point of incurability and lethality, and, as we observed in Part II, the evidence allowed a finding that Ms. Tzemach's failure to seek medical assistance after January, 1984, did more than simply exacerbate her injury. It directly contributed to it by precluding diagnosis and treatment at a time when the cancer was still probably curable.

Nor is this a case like *McClees v. Cohen,* 158 Md. 60, 148 A. 124 (1930), where a patient's failure to seek further assistance was excused on the ground that the dentist in that case had seen "no necessity for any further treatment of the plaintiff by him" and that "[i]n the absence of any instructions from the dentist to return for treatment, the plaintiff would not be chargeable with his omission." *Id.* at 67, 148 A. 124. Here, of course, Ms. Tzemach was under specific and repeated instructions to report back if the lump she felt did not disappear. This was not a one-time procedure, the conclusion of which ended the doctor-patient relationship.

The correct rule, we think, is expressed in 70 C.J.S. *Physicians and Surgeons* § 80(c):

> "A patient who, after receiving treatment, fails to return to the physician or surgeon for further treatment, *as instructed,* is guilty of contributory negligence preventing recovery *for injurious consequences from such failure.* However, where the physician considers the treatments ended, and does not instruct the patient to return, the patient is not chargeable with negligence for failure to return."

(Footnotes omitted; emphasis added.) *See Jamas v. Krpan,* 116 Ariz. 216, 568 P.2d 1114 (App.1977); *Mecham v. McLeay,* 193 Neb. 457, 227 N.W.2d 829 (1975); *Grippe v. Momtazee,* 705 S.W.2d 551 (Mo.App.1986); *and cf. Reikes v. Martin,* 471 So.2d 385 (Miss.1985); *Ayoub v. Spencer,* 550 F.2d 164 (3d Cir.), *cert. denied* 432 U.S. 907, 97 S.Ct. 2952, 53 L.Ed.2d 1079 (1977).

This view is consistent with the general notion of contributory negligence expressed in *Menish v. Polinger Company,* 277 Md. 553, 561, 356 A.2d 233 (1976), and quoted with approval in *Moodie v. Santoni,* 292 Md. at 587, 441 A.2d 323:

> "[W]hen one who knows and appreciates, or in the exercise of ordinary care should know and appreciate, the existence of danger from which injury might reasonably be anticipated, he must exercise ordinary care to avoid such injury; when by his voluntary acts or omissions he exposes himself to danger of which he has actual or imputed knowledge, he may be guilty of contributory negligence."

By expressing the concept in the context of the plaintiff's response to a known danger from which injury might reasonably be anticipated, this language indicates rather clearly that, to be contributory, the plaintiff's negligence need not always be congruent in time with the defendant's negligence. The test is not simultaneity but whether the plaintiff's dereliction has significantly contributed to the injury for which he or she sues. Where, as so often is the case, the injury does not occur immediately upon the defendant's negligence but arises later, it is entirely possible for the plaintiff, by his or her own negligent act or omission, to contribute to the actual creation of the injury.

This is especially so in cases of cancer, and most particularly in cases of breast cancer. The record reveals, and indeed we may almost take judicial notice from the widespread publicity emanating from the medical community and public health authorities, that breast cancer is a major killer of women, that if detected early it is curable, and that,

to a large extent—if not to a primary extent—early detection requires periodic self-examination and the prompt reporting of *any* suspicious lumps or changes in the breast. To adopt the view that it is not negligent for women to ignore breast changes that are obvious to them would defy medical reality and thus be absurd. But, in essence, that is the proposition urged by appellants—that the law should excuse such negligence, however clear and egregious, provided it follows in time some misdiagnosis or delayed or incorrect intervention by a doctor, and notwithstanding that, but for the neglect, there would be a better-than-even chance of obtaining proper treatment and cure. There is simply no rationality to such a view.

On the facts of this case, we believe that the issue of Ms. Tzemach's contributory negligence was properly submitted to the jury. What happened to Ms. Tzemach was an awful tragedy, to which we are not unsympathetic; unfortunately for appellants, however, it was a tragedy that the evidence shows she could have avoided.

JUDGMENT AFFIRMED; APPELLANTS TO PAY THE COSTS.