**HEADNOTE:** *Scott Wadsworth, et al. v. Poornima Sharma, M.D., et al.*, No. 1703, September Term 2019

<u>Death</u>:  Beneficiaries of a decedent in an action brought under Maryland's wrongful death statute can make no recovery even if they can show that the defendant's negligence shortened the decedent's life expectancy if they cannot prove that the defendant's negligence caused the decedent's death.

<u>Death</u>:  Under Maryland's survival statute, a personal representative of the decedent's estate may recover for conscious pain and suffering, medical expenses and loss of wages caused by the defendant's negligence even if the personal representative can not prove that the defendant's negligence caused the decedent's death.

<u>Damages</u>:  In a survivorship action, a personal representative may recover the lost wages that resulted from the defendant's negligence, but such damages are measured from the period between the inception of the loss of earnings until death.

<u>Damages</u>:  In a survivorship action, personal representative may recover for decedent's fright and mental anguish if: 1) the defendant's negligence shortened the decedent's life expectancy; 2) the decedent knew that the defendant's negligence shortened his or her life expectancy; and 3) based on that knowledge, the decedent experienced fear or mental anguish.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1703

September Term, 2019

_____

SCOTT WADSWORTH, ET AL.,

v.

POORNIMA SHARMA, M.D., ET AL.

_____

Shaw Geter,
Wells,
Salmon, James P.
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Salmon J.
_____

Filed:  July 1, 2021

 Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The main problems to be resolved in this case are ones of first impression and can be summarized as follows: A patient sees an oncologist in April 2013 at a point where she has stage IV metastatic[1] breast cancer. No one survives that type of breast cancer. Nevertheless, with proper treatment, she, at that point, had a life expectancy of eighty months. As a result of the doctor's negligence, the cancer was not discovered at that time. Almost three years later, in February 2016, the cancer was discovered by another healthcare provider. Thereafter, the patient received the same cancer treatment that she would have received if the cancer had been discovered in April of 2013. The patient died of metastatic breast cancer, at age 53, in June 2017. Thereafter, her personal representative brought a survivorship action against both the doctor who had failed to diagnose the cancer and the doctor's employer. The patient's husband and other close relatives of the patient ("plaintiffs-appellants") also filed a wrongful death action against the same defendants. The plaintiffs-appellants claimed that the doctor's negligence, although it did not cause the victim's death, shortened her life expectancy by thirty months. The questions presented are:

(1) Do the relatives of the decedent have a viable wrongful death action against the doctor or her employer?

(2) Can the personal representative of the decedent successfully bring a survivorship action against the doctor or her employer in this matter?

We shall answer "no" to question 1 and "maybe" as to question 2.

---

[1] The word "metastatic" refers to cancer that has spread beyond the part of the body where it originated.

A Baltimore County circuit court judge considered a summary judgment motion filed by the oncologist and her employer ("defendants-appellees") that raised the aforementioned two questions. The motions judge answered "no" to both questions. He reasoned that to prevail, the plaintiffs-appellants would have to prove that the defendants-appellees' (alleged) negligent failure to diagnose the cancer destroyed a substantial (better than 50%) possibility of survival. The court stressed that at the time of the misdiagnosis, the decedent did not have a substantial chance of surviving the breast cancer and therefore the plaintiffs-appellants could not prove that the negligent act caused the decedent's death. In granting summary judgment, the court also opined that plaintiffs-appellants were attempting to proceed under the "loss of chance" doctrine, which is not recognized in Maryland.

Plaintiffs-appellants filed a motion for reconsideration in which counsel for the personal representative explained, for the first time, exactly what damages he sought to recover in the survivorship action. Counsel said:

> [T]he evidence in this case demonstrates, had Plaintiffs' Decedent's solitary bone-only breast cancer metastasis been timely diagnosed and appropriately treated by Defendants in April 2013, as was required by the standards of care, Plaintiffs['] Decedent, Stephanie Wadsworth, would have, more likely than not, lived an additional 30-months (or 2.5-years) beyond June 10, 2017, (well into December 2019), and would still be alive today enjoying the love and company of her surviving husband, daughter, son, and father. This is a legally cognizable injury. Stephanie Wadsworth should not have died on June 10, 2017. <u>Two and a half years of life, time, and precious moments were unnecessarily taken from Stephanie Wadsworth. This is Stephanie</u>

Wadsworth's injury for which her beneficiaries [2] stand in her shoes in the Plaintiffs' survival action.

(Emphasis added.)

In this opinion, we shall refer to the above as the "lost years" argument.

## I.

### Factual Background[3]

Stephanie Wadsworth died on June 10, 2017 survived by her husband, Scott Wadsworth, her father, Joseph Eline, Jr. and two children, Elizabeth Wadsworth and Matthew Wadsworth. On October 18, 2018, the aforementioned relatives filed a First

---

[2] Technically, in a survivorship action, the decedent's "beneficiaries" do not "stand in the shoes" of the decedent; instead, the decedent's personal representative does.

[3] The facts set forth in part I of this opinion are presented in the light most favorable to the plaintiffs-appellants, the non-prevailing parties below. *See Todd v. Mass Transit Admin.*, 373 Md. 149, 155 (2003). Many of those facts are vigorously denied by defendants-appellees, although they are accepted by them for purposes of resolving the issues presented by the grant of the summary judgment motion.

One of the main areas of disagreement is whether the two oncologists named as experts by plaintiffs-appellants, had any scientific basis to predict that with timely treatment, the decedent would have lived an additional two-and-a-half years. Dr. J. M. Feigert, an oncologist named by the defense as an expert witness, was deposed by plaintiffs-appellants' counsel. He brought with him a 2018 medical journal article that expressed the view, with which Dr. Feigert agreed, that there have been no clinical studies that have proven that early aggressive treatment, once metastatic breast cancer is discovered, improves life expectancy. Dr. Feigert testified that the opinions of the oncologists named by plaintiffs-appellants (that with early treatment, the decedent would have lived two or two-and-a-half years longer), is "a theory, not based in science, not based in any clinical studies that have been proven." Prior to the grant of summary judgment, counsel for defendants-appellees asked for an evidentiary hearing to determine whether the proposed testimony by plaintiffs-appellants' experts was scientifically valid and whether the reasoning of the experts could be appropriately applied in the subject case. Because summary judgment was granted in favor of defendants-appellees, those issues were not resolved.

Amended Complaint ("the complaint") in the Circuit Court for Baltimore County. One count alleged a wrongful death action against defendants-appellees Poornima Sharma, M.D., University of Maryland Oncology Associates, P.A. ("UMOA") and University of Maryland Community Medical Group, Inc. ("UMCMG"). The complaint alleges that at the time of the failure to diagnose, Dr. Sharma was employed by both UMCMG and UMOA. In the same complaint, Scott Wadsworth, as personal representative of the estate of Stephanie Wadsworth ("Mrs. Wadsworth"), filed a survivorship action against the same defendants-appellees.

The complaint alleged that in 2006, Mrs. Wadsworth was diagnosed with stage IIIC left breast cancer, for which she underwent a mastectomy of the left breast, followed by radiation and chemotherapy. In 2006, 2007, and 2008, she underwent a series of follow-up PET/CT scans that were all negative for metastatic cancer. Those follow-up PET/CT scans were ordered by Dr. Sharma who was Mrs. Wadsworth's treating oncologist.

On April 1, 2013, Mrs. Wadsworth underwent another follow-up PET/CT scan. The imaging demonstrated an abnormal finding that a radiologist, at that time, described as a "[f]ocus of increased uptake in the right proximal clavicle of undetermined significance." According to plaintiffs-appellants, the radiologist's reading indicated new and potentially cancerous lesions not present on prior studies.

Dr. Sharma received, reviewed and was aware of the abnormal 2013 PET/CT scan but, according to plaintiffs-appellants' complaint, never reported the results to either Mrs. Wadsworth or her other treating healthcare providers. Moreover, Dr. Sharma never ordered any follow-up tests. These failures on Dr. Sharma's part, according to the

4

plaintiffs-appellants, constituted actionable medical negligence even though Mrs. Wadsworth, in April of 2013, already had stage IV metastatic breast cancer, which was not curable.

Between April 2013 and February 2016, Mrs. Wadsworth had no pain or other noticeable problems related to her breast cancer, but in February 2016, she fell and injured her right shoulder. She went to a hospital on February 29, 2016 complaining of right shoulder pain. A diagnostic bone scan revealed an aggressive malignant bone lesion in her right clavicle. Shortly, thereafter, a tissue biopsy confirmed the diagnosis of metastatic cancer in her left breast. A March 2016 PET/CT scan revealed a worsening metastatic lesion in the middle right clavicle. Mrs. Wadsworth was then given aggressive and appropriate treatment and therapy (the same treatment and therapy she would have received if the lesion had been properly diagnosed in April 2013), but as mentioned earlier, she died on June 10, 2017. Had her cancer been properly diagnosed in April 2013, according to one of the plaintiffs-appellants' experts, she would have lived an additional 30 months, i.e., until December 2019 (approximately).[4]

---

[4] Expert testimony concerning how long Mrs. Wadsworth would have lived had she been properly diagnosed in April 2013, was given by Dr. Andrew M. Schneider. In his report written prior to suit, Dr. Schneider said that if the cancer had been diagnosed in April 2013, "Mrs. Wadsworth would have enjoyed a favorable prognosis, including long term [survival ?] over several years." When he was deposed, Dr. Schneider modified the wording of that opinion slightly. In an answer to a deposition question posed by plaintiffs-appellants' counsel, he opined that Mrs. Wadsworth, if the cancer had been diagnosed in April 2013, would have lived two-and-a-half years longer than she did. The pertinent exchange was:

(continued…)

One of plaintiffs-appellants' oncology experts, Dr. Andrew M. Schneider, testified at deposition in answer to questions posed by defense counsel, that Mrs. Wadsworth's pain and suffering would have been the same if she had lived an additional 30 months as the pain and suffering she actually experienced when she died 30 months prematurely. The pertinent questions and answers were:

> Q: The additional two-and-a-half years that you believe Ms. Wadsworth would have had, what would her quality of life have been like during those two-and-a-half years?
>
> A: Excellent. So most cancer patients die fast so they do well until they kind of just don't do well and they die, you know within weeks or, you know, a month or two. They don't have prolonged luckily, prolonged, you know, pain and suffering.
>
> Q: Is it your testimony that she would have been in excellent health until a few weeks or month until she ultimately expired two-and-a-half years after when she did?
>
> A: Well, I don't know how you define excellent health when you have metastatic cancer, but let's say that she would have had a good performance status and would have been able to enjoy life.
>
> Q: What do you mean by "good performance status"?
>
> A: Functionally. You know, she's walking, talking, eating, going out to dinner, living life. I can't say she was in excellent health, but she had metastatic cancer. You know, that I can't say.

> Q: So it's your testimony, within a [reasonable degree of] medical certainty, had she been diagnosed shortly after April 1, 2013 and treated at that time, she would have survived an additional two-and-a-half years?
>
> A: Correct.

Another oncologist named by plaintiffs as an expert was Dr. James Stark, who testified at deposition that, to a reasonable degree of medical certainty, if Mrs. Wadsworth had been appropriately diagnosed in April 2013, she would have lived an additional two years – i.e., until June 2019.

Q: Would you have expected, based on what you reviewed in records, in addition to depositions of family members, that, of course, at the end, the way it actually was, would have been similar had she lived another two-and-a-half years?

A: I think at some point when she was going to die it would have been a similar course, yes.

Q: Do you have an opinion as to what point in time it would have taken a turn?

A: I already told you I thought I said, you know, weeks to a few months before death.

## II.

### *Question I – The Wrongful Death Claim*

At common law, relatives of a decedent who died as a result of the negligence of another, had no cause of action against the tortfeasor. *Stewart v. United Elec. L. & P. Co.*, 104 Md. 332, 333-34 (1906). This changed in 1852 when the Maryland legislature passed a statute that was "almost a literal transcript of *Lord Campbell's Act* (9 and 10 Vic., ch. 93), [that] gives a right of action under certain conditions to designated relatives of a deceased person, but not to his personal representatives, when death has been caused by a wrongful act or by negligence." *Id*. at 334. Since 1852, the Maryland Wrongful Death Statute has been revised on several occasions. It is now codified in sections 3-901 through 3-904, Maryland Code Annotated (1974, 2020 Repl. Vol.), of the Courts and Judicial Proceedings Article ("CJP"). Section 3-902(a) of that article reads:

> (a) *Action against person causing death of another*. – An action may be maintained against <u>a person whose wrongful act causes the death of another</u>.

7

(Emphasis added.)

Section 3-904 of CJP spells out who may sue for wrongful death and the type of damages that may be recovered.

Because the wrongful death statute is in derogation of common law, it must be strictly construed. *McKeon v. State*, *Use of Conrad*, 211 Md. 437, 443 (1956). And, as can be seen, the statute indicates that for a plaintiff to succeed in a wrongful death action, proof must be presented that the defendant's "wrongful act cause[d] the death of another." In a wrongful death action, death is the only injury for which plaintiff(s) may sue. *United States v. Streidel*, 329 Md. 533, 540 (1993).

One of plaintiffs-appellants' main contentions is that under the wrongful death statute, the family of Mrs. Wadsworth may recover damages for "30 months or 2.5 years, of precious time" that, absent Dr. Sharma's negligence, she would have lived. According to plaintiffs-appellants, proof that Dr. Sharma shortened Mrs. Wadsworth's life by 30 months was sufficient to show that Dr. Sharma's wrongful act caused Mrs. Wadsworth's death. Plaintiffs-appellants also assert that "knowing that [Mrs. Wadsworth's] time on earth with her family was limited because of her Stage IIIC cancer[5] made those '30 months or 2.5 years, of precious time' all the more dear, and the injury more gravely felt, as those with terminal illnesses live a Marshallian demand curve" (hereinafter "the precious time argument"). A footnote that accompanies the precious time argument reads: "*See generally* ALFRED MARSHALL, PRINCIPLES OF ECONOMICS (Macmillan, 8th ed., 1949) (explaining

---

[5] At the time of the alleged misdiagnosis, Mrs. Wadsworth had stage IV cancer, not as plaintiffs-appellants' counsel implied, stage IIIC.

that when supply dwindles, demand and value increase proportionately).” In other words, plaintiffs-appellants claim that under Maryland's wrongful death statute they have a cause of action even though the doctor's negligence did not cause the death, if they can show defendants-appellees' actions shortened the decedent's life.

The aforementioned argument is undercut by what the Court of Appeals said in *Weimer v. Hetrick*, 309 Md. 536, 554 (1987):

> In plain, unambiguous language, the statute provided a cause of action unknown to the common law for the benefit of described beneficiaries "against a person *whose wrongful act caused the death of another*." (emphasis added). In such circumstances, there is no room for judicial interpretation. *Trimper v. Porter-Hayden*, 305 Md. 31, 36 (1985).

The relevant facts in *Weimer* were as follows. On September 9, 1978, Jody Hetrick gave birth to a son who was delivered by caesarian section. *Id.* at 539. The child was born prematurely and in poor physical condition. *Id.* at 539-40. After delivery, the baby came under the care of Dr. Stanley R. Weimer. The child died shortly after birth. Thereafter, Jody Hetrick and her husband filed a wrongful death suit against Dr. Weimer. At trial, an expert retained by the Hetricks testified that Dr. Weimer's efforts at resuscitation were not in keeping with the required standard of care, *id.* at 539-40, and that if appropriate care had been provided the baby's chance of survival would have been about "80 to 90%." *Id.* at 540. Dr. Weimer produced expert testimony supporting his contention that his performance met the appropriate standard of care and that he "did nothing that caused or contributed to the baby's death." *Id.* at 541. The jury found in favor of Dr. Weimer. *Id.*

The issue presented in *Weimer* was whether the trial judge erred when he instructed the jury as to the wrongful death claim that the "plaintiff was required to prove by a

9

preponderance of the evidence that [the] death of the decedent was caused by the negligence of the defendant." *Id*. at 542.[6] Counsel for the Hetricks contended that the jury should have been instructed that the plaintiffs could meet their burden by showing that the doctor's negligence took away a "substantial possibility" of survival even if that chance was less than 50%. *Id*. at 543. This Court held that the trial judge <u>did</u> <u>err</u> when he instructed the jury, saying:

> [T]he instruction that the plaintiffs had to prove, by a preponderance of the evidence, that the physician's negligence was the primary or most probable cause of the patient's death imposed an improper burden upon them. The theory of appellants' case was not that Dr. Weimer caused their son's death; it was that Dr. Weimer's failure to do what was reasonable, proper, necessary and appropriate to resuscitate Jason deprived the child of a substantial possibility of survival.

*Hetrick v. Weimer*, 67 Md. App. 522, 541, *cert. granted*, 307 Md. 469 (1986).

The Court of Appeals reversed our decision, holding that the trial judge correctly instructed the jury. 309 Md. at 554-55. In reversing, the Court summarized and quoted with approval what was said in *Brady v. Consolidated Gas Co.*, 85 Md. 637, 641-42 (1897):

> All the cases agree that to constitute a good cause of action, there should be stated and proved a *right* on the part of the plaintiff, and a *duty* on the part of the defendant in respect to that right, and a breach of that duty by the defendant, *whereby* the alleged injury was produced. Between the negligence and the injury there must be the relation of cause and effect. *Maenner v. Carroll*, 46 Md. [193,] 212 [(1877)]; *W.U. Tel. Co. v. State*, *use of Nelson*, 82 Md. [293,] 310 [(1896)]; *Holly v. Boston Gas Light Company*, 8 Gray 123 [(1857)]; [*Baltimore & Ohio Railroad Co. v. State, use of Trainor*], 33 Md. [542,] 554 [(1871)]. . . .

---

[6] In *Weimer*, no question was raised in regard to the survivorship claim brought by the personal representative of the baby. 309 Md. at 545. Accordingly, as to the survivorship count, "the question whether Maryland recognizes the loss of a substantial chance of survival as a measure of damages . . . was not raised or decided[.]" *Id*.

10

Having these well-established legal principles in view, we now proceed to a consideration of the facts in proof, bearing in mind that the *onus* is on the plaintiff to show affirmatively all the elements of the right to recover. It was necessary for the plaintiff in this case to prove (1) the death of Miss Brady; (2), the negligence of the defendant, and (3), that such negligence was the cause of Miss Brady's death.

309 Md. at 547 (some emphasis added).

The Court of Appeals held in *Weimer* that the plaintiff, in a wrongful death action, must prove that it was more likely than not (preponderance of evidence) that Dr. Weimer's negligence caused the decedent's death. *Id*. at 550-553. In the words of the *Weimer* Court, "it is crystal clear that determination [by a fact-finder] of such questions [whether the defendant's negligent conduct caused the decedent to lose less than a 50% chance of survival] is impermissible in an action for wrongful death under the Maryland statute." *Id*. at 554.

Under the loss of chance doctrine, a plaintiff in a wrongful death action may recover even though the decedent's chance of survival at the time of the negligent act was less than 50%. *See Cooper v. Hartman*, 311 Md. 259, 263-66 (1987). Thus, the Court of Appeals in *Weimer*, rejected the "loss of chance doctrine" when it held that the trial judge had correctly instructed the jury in a wrongful death action, that the plaintiff(s) must show, by a preponderance of evidence, that the conduct of the defendant "was a proximate cause of the death of the decedent." 309 Md. at 554. *See also Barton v. Advanced Radiology, P.A.*, 248 Md. App. 512, 531 (2020), *cert. dismissed as improvidently granted*, No. 56, Sept. Term, 2020, 2021 WL 2324965 (Md. June 8, 2021) (noting that "unless and until the Court of Appeals announces a significant revision of its holdings in *Weimer* or *Fennell* [*v*.

11

*Southern Maryland Hosp. Ctr., Inc.*, 320 Md. 776 (1990)], loss of chance remains unavailable as a cause of action in medical malpractice wrongful death and survival claims").

In *Chudson v. Ratra*, 76 Md. App. 753 (1988), which was decided about one year after *Weimer*, the rule we applied was based on the Court of Appeals' decision in *Weimer*. *Id.* at 766. The *Chudson* Court held that the case was appropriately tried:

> as to primary and contributory negligence, on the theory that the party with the burden of proof had to demonstrate that the <u>other's negligence occurred at a time when the cancer was still probably curable</u>, i.e., that there was then a better-than-even chance that had the party not been negligent, the cancer could have been successfully treated.

*Id.* (emphasis added).

In *Fennell*, 320 Md. 776, the Court of Appeals, citing *Weimer*, reiterated that in order to recover damages under the wrongful death statute, the plaintiff must prove by a preponderance of evidence, that the death was caused by the wrongful act of the defendant. *Id.* at 783. *See also Marcantonio v. Moen*, 406 Md. 395, 416 (2008) (same) and *Wittel v. Baker*, 10 Md. App. 531, 542 (1970) (cause of action for wrongful death can only be brought successfully if "death ensues from the tort.").

Here, the defendants-appellees, applying the *Weimer* test to the case *sub judice*, argued in the circuit court and in this Court that plaintiffs-appellants did not demonstrate that as of April 1, 2013, Mrs. Wadsworth's cancer was "still probably curable." They stress that plaintiffs-appellants' own experts said that as of April 2013, Mrs. Wadsworth's cancer was <u>not</u> curable; therefore, a wrongful death action by plaintiffs-appellants could not succeed. We agree with that argument and hold that under Maryland's wrongful death

12

statute, a relative of a decedent cannot recover damages unless the relative can prove that the defendant's negligence caused the decedent's death. Thus, we reject plaintiffs-appellants' "precious years" argument. In other words, the motions judge was correct when he refused to allow plaintiffs-appellants to recover solatium-type damages for the two-and-a-half years that they were deprived of Mrs. Wadsworth's company.

Plaintiffs-appellants disagree, arguing:

Defendants'[-appellees'] argument is violative of common sense. After all, *mors naturae lex est*: death is the law of nature. Inherent in a wrongful death action is the natural law that every person will die, and that a tortfeasor or negligent actor caused the death to come sooner, or in a different manner, than it would have come otherwise. If claims were precluded because the plaintiff[-appellant] will eventually die—and it is beyond refute that *mors naturae lex est*—then no claims could be brought at all. *See id*. This manifest logic has been explicitly recognized by the Supreme Court of Virginia and the Fourth Circuit. *See Murray v. U.S.*, 215 F.3d 460, 466 (4th Cir. 2000) (quoting with approval a decision of the Supreme Court of Virginia, which held that a "plaintiff's burden . . . [i]s simply to prove that the particular time and manner of the patient's death resulted from the defendant's[-appellee's] negligence[,]" and that the plaintiff need not prove "that the patient would have recovered perfect health, or survived indefinitely in the absence of the negligence").

(Footnote omitted.) (Emphasis added.)

This argument is flawed. Appellants provide no support for the contention that "inherent in a wrongful death action," is the "natural law" that everyone will die. Plaintiffs-appellants' claim was not denied because "eventually" everyone will die. It was denied because plaintiffs-appellants could not prove that Dr. Sharma caused the death of Mrs. Wadsworth. Moreover, defendants-appellees' argument is not "violative of common sense" because the words of the wrongful death statute state that a wrongful death action may only be brought "against a person whose wrongful act causes the death of another."

13

We turn now to a review of the *Murray* case, 215 F.3d 460 (4th Cir. 2000) and the Virginia Supreme Court case upon which plaintiffs-appellants rely. In *Murray v. U.S.*, an emergency room army doctor treated a patient suffering from severe abdominal pain. *Id.* at 461. The doctor erroneously diagnosed the problem as a urinary tract infection and released the patient. But before the patient left the hospital grounds, he collapsed and was readmitted to the hospital. *Id.* The patient died less than two hours after readmission. An autopsy showed that the patient died of an abdominal aneurysm. *Id.* The patient's widow sued the United States government under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, and sought damages pursuant to the Virginia wrongful death statute, Va. Code § 8.01-50 *et seq.* *Id.* at 461-62. A federal district court judge, sitting as the trier of fact, found that the army doctor's diagnosis was negligent. *Id.* at 462. The judge also found that the doctor was negligent because he should have referred the patient to another hospital where he could have received a "CT-scan and life saving surgery." *Id.* Nevertheless, the trial judge found that neither party had proven by a preponderance of evidence whether the decedent would have survived if he had received the "life saving" surgery. *Id.* But, according to the judge, such proof was not necessary. Accordingly, the district court judge awarded wrongful death damages to the patient's widow. *Id.*

On appeal, the *Murray* Court summarized the lower court's reasoning:

The court found that Mr. Murray possibly could have obtained life saving surgery, and his possibility of survival in these circumstances was between thirty and sixty percent. The court reached these percentages by combining the percentage survival rate with the possibility of obtaining surgery in the available time frame. The court then found that thirty to sixty percent constitutes a substantial possibility that Mr. Murray could have obtained life saving surgery. Based on this finding, the court concluded that the plaintiff

14

had proven that the defendant's negligence was a proximate cause of Mr. Murray's death.

*Id.* (quotations marks and citations omitted).

In *Murray*, the Fourth Circuit Court of Appeals reversed the judgment entered by the district court. *Id.* at 467. After reviewing several federal and Virginia cases interpreting Virginia's wrongful death statute, the *Murray* Court stated:

> This court therefore views a "substantial possibility of survival" as equivalent to a "probability" of survival. A probability is a "condition or state created when there is more evidence in favor of the existence of a given proposition than there is against it." *Black's Law Dictionary* 1201 (6th ed. 1990). It implies something that "is more likely than not, or that is greater than 50%." *Hurley*[ *v. U.S.*], 923 F.2d [1091,] 1095 n.26. [(4th Cir. 1991)]. Thus, applying the "substantial possibility of survival" concept to the causation element of medical malpractice cases does nothing more than require a plaintiff [in a wrongful death case] to <u>prove that it is more likely than not that the decedent would have survived in the absence of the defendant's negligence</u>.

*Id.* at 464-65 (footnote omitted) (emphasis added).

That holding in *Murray*, of course, does not help the plaintiffs-appellants. It is in complete accord with the defendants-appellees' position in this case. What plaintiffs-appellants rely on is what the *Murray* Court said immediately after that holding was announced, when it discussed *Blondel v. Hays*, 403 S.E.2d 340 (Va. 1991), a Virginia wrongful death case in which the jury found in favor of the defendant-doctor and against relatives of Sheehan Blondel, who died shortly after giving birth. 215 F.3d at 466-67. The liability issue in *Blondel* was whether the death of the patient would have been avoided if the defendant had performed a caesarean section earlier. *Blondel*, 403 S.E.2d at 342. The legal issue presented in *Blondel*, was whether the trial judge erred when he instructed the

15

jury that to recover for the mother's death, the plaintiff would have to prove that the defendant's negligence "was a proximate cause of the [decedent's] death[.]" *Id*. at 344. The trial judge instructed the jury that:

> A proximate cause of an injury or death is a cause which in natural and continuous sequence produces the injury or death. It is a cause without which the injury or death would not have occurred.

*Id*. at 342.

The Supreme Court of Virginia held in *Blondel* that the trial court did not err in rejecting plaintiff's proposed jury instruction, which was based on the loss of chance doctrine and read:

> If you find that Dr. Hays was negligent, and you find that such negligence destroyed any substantial possibility that Ms. Sheehan-Blondel would have survived, then your verdict must be for Mr. Blondel on his claim for the wrongful death of his wife.

*Id*. at 343.

The Virginia Supreme Court in *Blondel* acknowledges that a number of states had adopted the "substantial possibility of survival" standards and had allowed recovery when the chances of survival were as low as 2%. *Id*. at 344. But the *Blondel* Court rejected that approach. *Id*. at 345. Nevertheless, in explaining that rejection, the *Blondel* Court used language that was quoted with approval in *Murray* (215 F.3d at 466) and relied upon by plaintiffs-appellants in this case. The language used and its context was accurately summarized in *Murray* as follows:

> *Blondel* involved an appeal from a trial court's denial of the plaintiff's requested jury instruction on the "substantial possibility of survival" standard. The plaintiff argued that he was entitled to an instruction informing the jury of the principle of Virginia law that "a defendant physician's

16

destruction of 'any substantial possibility of the <u>patient's survival' is 'a proximate cause of the patient's death</u>.'" *Id*. at 343. The plaintiff further argued that the traditional proximate cause instructions given by the court were <u>improper because they "require him to prove that the patient would have recovered perfect health, or survived indefinitely in the absence</u> of the negligence." *Id*. at 344. The Virginia Supreme Court rejected the plaintiff's argument, stating: "<u>The plaintiff's burden . . . was simply to prove that the particular time and manner of the patient's death resulted from the defendant's negligence</u>. In that respect, his burden is no different from that attendant upon any other actions for personal injuries or wrongful death." *Id*.

*Murray*, 215 F.3d at 466 (quoting *Blondel*, 403 S.E.2d 340) (footnote omitted) (emphasis added).

In this appeal, plaintiffs-appellants embrace the "time and manner of . . . death" language used in *Blondel* and quoted with approval in *Murray*. Plaintiffs-appellants interpret the language to mean that in Virginia, a plaintiff in a wrongful death action can prevail if the plaintiff can prove that defendant's negligence shortened the decedent's life expectancy even if the defendant did not cause the decedent's death. Reliance on that language to represent Virginia law is extremely questionable because the "time and manner" language was clearly *dicta*. In neither *Murray* nor *Blondel* was there any issue of shortened life expectancy. More important, it is unlikely in the extreme that the Virginia Supreme Court intended to adopt plaintiffs-appellants' interpretation of the Virginia statute and allow a wrongful death claim for shortened life expectancy. We say this because in *Blondel*, the Virginia Supreme Court explicitly approved an instruction telling the jury that to recover, the plaintiff must prove that the defendant's evidence was the proximate cause of the decedent's death, i.e., "a cause without which the . . . death would not have occurred." 403 S.E.2d at 343.

17

In any event, even if plaintiffs-appellants have correctly interpreted Virginia law, such an interpretation would not govern the outcome of this case in light of *Weimer* and the other Maryland cases we have cited that hold that in a Maryland wrongful death case, the plaintiff(s) must prove that the defendant's negligence more likely than not (better than 50% chance) caused decedent's death.

Plaintiffs-appellants also rely on *Pieczonka v. Pullman Co.*, 89 F.2d 353 (2d Cir. 1937), a case in which a worker sued his employer because he contracted silicosis due to his employer's negligence. *Id*. at 354-55. Prior to trial, the worker died of silicosis. A wrongful death suit was then filed by the worker's widow. Part of the wrongful death claim was barred by the statute of limitations, i.e., all injuries suffered by the employee due to his employer's negligence prior to July 5, 1929. *Id*. at 356. But proof in that case showed that the decedent continued to work for his employer and continued to be exposed to harmful siliceous particles until September 12, 1931. *Id*. In *Pieczonka*, one of the issues to be decided was whether the decedent's widow could make a partial wrongful death recovery for the injuries that were not barred by limitations, even though her husband would have died from silicosis anyway had he not worked from July 1929 to September 1931. The Court, in applying New York law, held that the widow could make a partial recovery to the extent that her husband's exposure (during the period not barred by limitations) shortened the decedent's life. Superficially, the case may appear on point because it allowed a plaintiff to recover damages in a wrongful death case for a decedent's shortened life expectancy, but ultimately, in our view, *Pieczonka* is inapposite. In *Pieczonka*, unlike the case *sub judice*, there was no question, but that the defendant's

18

negligence did cause the worker's death. Here, there was no question but that the doctor's negligence did not cause the decedent's death.

Plaintiffs-appellants also cite *Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963 (7th Cir. 1983). That case is not on point because it did not involve a death and therefore the Court was not called upon to interpret a wrongful death statute.

Another major argument raised by plaintiffs-appellants is that they did present evidence to the motions judge proving that as of the time of the failure to diagnose (April 2013) there was more than a 50% chance that the stage IV cancer was survivable. According to plaintiffs-appellants, "survival" in the context of a cancer prognosis means "probability of five-year, long-term survival." The only legal authority that plaintiffs-appellants present in support of that argument is *Chudson*, *supra*, which we will discuss, *infra*.

For factual support, plaintiffs-appellants point to the deposition testimony of their oncology expert, Dr. Andrew M. Schneider. The pertinent part of Dr. Schneider's testimony occurred in the following exchange:

Q: Doctor, based on your knowledge, training and experience, and your review of the medical literature, specifically that article that you brought with you here today, do you have opinions, to a reasonable degree of medical probability what Ms. Wadsworth's chances of long-term five-year survival were as of April 2013 had her cancer been diagnosed or treated?

[Objections omitted]

A: So the median survival of patients who have a—sorry. The five-year survival, patients who have a solitary bone met is around 70 percent. So more likely than not, had she started therapy for her metastatic disease in

19

2013, she would be alive five years later. As I said before, the median survival would have been 80 months.

Q: Okay. And, Doctor, based on your knowledge, training and experience, and in your review of the medical literature, do you have an opinion, to a reasonable degree of medical probability, what were Ms. Wadsworth's chances of survival given the alleged delay in diagnosis of her metastatic disease between April of 2013 and to 2016?

[Objection omitted]

A: So the failure to treat the bone-only metastasis in 2013 allowed this disease to progress to disease in the bone and now the lung or pleura which is a much worse scenario with a median survival, instead of 80 months, probably going down to around 18 months.

Q: So, Doctor, is it fair to say, to a reasonable degree of medical probability that Ms. Wadsworth's chances of long-term five- year survival went from greater than 50 percent to less than 50 percent as a result of the alleged delay and diagnosis and treatment?

[Objection omitted]

A: Absolutely true.

Both plaintiffs-appellants' opening and reply briefs assert that, in the context of cases construing the wrongful death statute, the *Chudson* Court "explained" that "'survival' means 'probability of five-year, long-term survival.'" The pin cite they provide in both their briefs to support that assertion is 76 Md. App. at 762. The *Chudson* Court gave no such explanation. Instead, in summarizing the testimony of the plaintiffs' expert, Dr. Lippmann, the Court said:

According to Dr. Lippmann, Stage 1 [cancer] exists when the tumor is less than two centimeters, no lymph nodes are involved, and there is no metastatic disease. Of patients having a Stage 1 breast cancer, approximately 75-80% are cured with proper treatment. Stage 2, he said, occurs when either the tumor is between two and five centimeters or when the tumor is less than two centimeters but there is nodal involvement. Dr.

20

Lippmann opined that 55-60% of patients with Stage 2 breast cancer can be cured of the disease.

Stage 3, according to Dr. Lippmann, involves either a tumor greater than five centimeters or a more advanced axillary lymph node disease. At that stage, only about 20-25% of patients can be cured of the disease; the balance of the patients (75-80%) die within five years. Finally, Stage 4 exists when the patient has metastatic disease that has spread elsewhere in the body; size of tumor and nodal involvement are irrelevant in that circumstance. Stage 4, said Dr. Lippmann, is not a "curable setting"; the five-year survival rate at that point is not more than one or two percent, and even those patients will eventually die of the disease.

*Chudson*, 76 Md. App. at 761-62.

As can be seen, Dr. Lippman never said that survival meant "probability of five-year, long-term survival." More important, the *Chudson* Court never said that nor did the *Chudson* Court in any way imply that "survival" meant "probability of five-year, long-term survival." The *Chudson* Court said something entirely different, i.e., that to prove the defendant is liable under the wrongful death statute, plaintiff had to prove that at the time of the doctor's negligence, "the cancer was still probably curable, i.e., that there was then a better-than-even chance," that had the defendant "not been negligent, the cancer could have been successfully treated." *Id*. at 766.

It is true that in many medical malpractice cases dealing with various forms of cancer, experts will testify as to five-year survivability rates. But such testimony does not establish a legal standard that can be used in interpreting the wrongful death statute especially in a case like this, where plaintiffs-appellants' own expert testified that no one survives stage IV metastatic breast cancer and that with a proper diagnosis and treatment, Mrs. Wadsworth, as of April 2013, would die of breast cancer in six-and-a-

21

half years.  Whether decedent would have been alive in five years is irrelevant when the issue is whether the doctor caused the patient's death.  *Cf. Barton*, 248 Md. App. at 535 (explaining that "[o]ur focus on appeal is whether, based on the entire record, a reasonable jury could have found that [the doctor's] negligence was a proximate cause of [the patient's] death").

Plaintiffs-appellants also contend that the motions judge misunderstood their argument to be that they could prevail under the loss of chance doctrine in a wrongful death case.  They disavowed any reliance on that doctrine.  Such a disavowal is understandable because even if Maryland allowed recovery under that doctrine, plaintiffs-appellants could not recover inasmuch as, both before and after the negligent act, the decedent's chance of surviving the disease was zero.  And, for the doctrine to be applicable, the patient's survival chance must be above zero.

The motions judge did not misunderstand the plaintiffs-appellants' position.  Their position was clear.  They contended, and the motions judge clearly understood the contention, that they could prove damages under the wrongful death statute even if they could not prove that Dr. Sharma caused Mrs. Wadsworth's death, so long as they could prove that the doctor's negligence shortened the decedent's life expectancy.

Alternatively, and despite their explicit disavowal of any reliance on the loss of chance doctrine, plaintiffs-appellants argue that we should overrule *Weimer* and recognize the loss of chance doctrine.  Plaintiffs-appellants give no explanation as to how such a reversal would help them, and as already noted, it would not.

In any event, this Court has no authority to overturn a Court of Appeals decision. And, even if we did have such authority, this would not be an appropriate case to exercise that authority. *See Marcantonio*, 406 Md. at 416, where the Court stated, as one of its reasons, that it would not reconsider the *Weimer* decision because "the facts as alleged [did] not support a loss of chance claim."

Plaintiffs-appellants also contend that interpreting the wrongful death statute so as to deny recovery to the relatives of Mrs. Wadsworth is, under Article 19 of the Maryland Declaration of Rights, unconstitutional. That Article 19 argument has been waived. It was not mentioned at all prior to the motions judge's oral grant of summary judgment. And in plaintiffs-appellants' motion for reconsideration, movants once again did not mention Article 19, or explain in any meaningful way why the *Weimer* Court's construction of the wrongful death statute was "unconstitutional." In their motion to reconsider, plaintiffs-appellants simply made the bald allegation that the motions judge's interpretation was "unconstitutionally narrow." In light of the language of the wrongful death statute, it is impossible to agree with plaintiffs-appellants that the motions judge's holding (that to prove death was caused by the defendant's negligence, a plaintiff must prove that it was more likely than not, i.e., over a 50% chance, that the decedent's death was caused by the defendant) was too narrow.

In summary, as to count II of the complaint asserting a wrongful death cause of action, plaintiffs-appellants had the burden of proving that the decedent's injury (death) was caused by the defendants-appellee's negligence. The evidence presented to the

motions court proved that at the time of the alleged negligence, the decedent didn't have an over 50% chance of a cure.

We reject plaintiffs-appellants' "precious time" argument. The relatives of Mrs. Wadsworth were not entitled to recover solatium type damages, or any other type of damages because they were deprived of the decedent's company, love and affection for 30 months. The motions judge had no choice but to grant summary judgment in favor of the defendants-appellees as to the wrongful death claim.

## III.

### *The Survival Action*

In the complaint, Mrs. Wadsworth's personal representative sought damages "suffered and sustained" by the decedent as a result of Dr. Sharma's negligence. The personal representative lists the damages suffered by the decedent in boiler plate language, *viz.*: conscious physical pain and suffering; mental and emotional distress and anguish; severe bodily injuries, damages, and discomfort; disability; fear; stress; anxiety; embarrassment; inconvenience; diminished quality of life; loss of the ability to enjoy the normal pleasures of life; loss of the ability to perform activities of daily living and household services; unnecessary hospitalizations and procedures; additional medical conditions and diagnoses; past medical, surgical, hospital, therapy, rehabilitation, medication, equipment and other necessary expenses; loss of employment, wages, income, and earning capacity; funeral, burial, and other related expenses; untimely death; and other

24

compensable injuries, losses, damages, and negative sequelae.[7] We have listed the precise damages that were claimed by the personal representative because, in considering a motion for summary judgment, one of the functions of allegations in the complaint is to "frame the issues" so that the court can determine whether there is any material issue of fact. *Washington Homes, Inc. v. Interstate Land Dev. Co.*, 281 Md. 712, 717 (1978) (quoting *VanHook v. Merchants Mut. Ins. Co.*, 22 Md. App. 22, 27 (1974)).

In regard to the survival action, we must determine whether, based on the injuries alleged in the complaint, there were any injuries for which the personal representative in the subject case could possibly recover when the defendant's-doctor's negligence did not cause the decedent's death but, instead, shortened the decedent's life expectancy.

For the reasons explained *infra*, we shall hold that the personal representative may possibly recover some damages even though he was unable to prove that Dr. Sharma's negligence caused the decedent's death. To explain why this is true, we start with an examination of the Maryland survival statute.

Courts & Judicial Proceedings Article § 6-401 provides

> (a) *At law*. – Except as provided in subsection (b) of this section, a cause of action at law, whether real, personal, or mixed, survives the death of either party.
>
> (b) *Slander*. – A cause of action for slander abates upon the death of either party unless an appeal has been taken from a judgment entered in favor of the plaintiff.

---

[7] We have quoted the damages claimed in plaintiffs-appellants' complaint verbatim except that in the complaint plaintiffs-appellants separated each category of damages so as to list the categories alphabetically, i.e., "a"-"s."

25

(c) *In equity*. – A right of action in equity survives the death of either party if the court can grant effective relief in spite of the death.

A related statutory provision, Maryland Code (2017 Repl. Vol.), § 7-401(y)(1) of the Estates & Trusts Article ("ET") provides, in relevant part, that a personal representative:

> may prosecute, defend, or submit to arbitration actions, claims, or proceedings in any appropriate jurisdiction for the protection or benefit of the estate, <u>including the commencement of a personal action which the decedent might have commenced or prosecuted, except that</u>:
>
> (i) A personal representative may not institute an action against a defendant for slander against the decedent during the lifetime of the decedent.
> (ii) In an action instituted by the personal representative against a tort-feasor <u>for a wrong which resulted in the death of the decedent</u>, the personal representative may recover the funeral expenses of the decedent up to the amount allowed under § 8-106(c) of this article in addition to other damages recoverable in the action.

(Emphasis added.)

In *United States v. Streidel*, 329 Md. at 540 n.5 the Court said:

The differences between a survival and a wrongful death action were clearly delineated in *Stewart v. United Elec. L. & P. Co.*, 104 Md. 332, 65 A. 49 (1906). Chief Judge McSherry writing for the Court stated: "The suits are by different persons, the damages go into different channels, and are recovered upon different grounds, and the cause of action though growing out of the same wrongful act or neglect, are entirely distinct. . . . Under [the Wrongful Death Act,] the damages recoverable are such as the equitable plaintiffs have sustained *by the death* of the party injured; [in a survival action,] the damages recoverable are only such as the deceased sustained in his lifetime. . . ." 104 Md. at 339-340, 65 A. at 52.[8]

---

[8] *See also Jones v. Flood*, 351 Md. 120, 125-28 (1998) and *Beynon v. Montgomery Cablevision*, 351 Md. 460, 474-75 (1998), for a good review of the statutory histories of the wrongful death and the survival statutes and the difference between those statutes.

26

It is important to emphasize that Section 6-401 of the Courts & Judicial Proceedings Article (dealing with a survival action) <u>does</u> <u>not</u> require that the plaintiff prove that death was caused by the defendants' negligence. The personal representative, unless he or she makes a claim for funeral expenses, must only show that the decedent, if he or she had lived, would have had a cause of action. Those damages "currently include conscious pain and suffering as well as medical expenses, but exclude future loss of earnings, solatium damages, and damages which result to other persons from the death." *Fennell*, 320 Md. at 792.

In this case, the defendants-appellees persuaded the motions judge that under the holding in *Fennell*, the personal representative could not recover damages under the survival act unless he could prove that Dr. Sharma's negligence caused Mrs. Wadsworth's death. The defendants-appellees were only partially correct. They were correct in so far as they contend that plaintiffs-appellants cannot recover funeral expenses because Dr. Sharma did not cause Mrs. Wadsworth's death. Moreover, defendants-appellees and the motions judge were correct in not allowing the personal representative to recover based on his "lost years" argument set forth in the motion for reconsideration. But, the defendants-appellees were incorrect insofar as they contended that, based on *Fennell*, the personal representative was entitled to make no recovery under the survival statute.

In this regard, it is important to closely scrutinize what was at issue in *Fennell* and to examine three other Court of Appeals cases dealing with plaintiffs who tried to recover for shortened life expectancy.

Cora Fennell entered Southern Maryland Hospital ("the Hospital") at 2:27 a.m. on July 14, 1981. *Fennell*, 320 Md. at 778-79. It was later discovered that, at the time of admission, she suffered from bacterial meningitis. *Id*. 779. She was treated by several doctors at the Hospital but was pronounced brain dead by 7:40 a.m. that same morning, *id*. at 778-79, and was kept on life support until she died in the early morning hours of July 15, 1981. *Id*. at 779. Mrs. Fennell's husband and her children brought a wrongful death action against the Hospital and in the same complaint, Mrs. Fennell's personal representative brought a survival action. The Hospital filed a motion for summary judgment as to both the wrongful death and the survival action. In their opposition to the summary judgment motion, the Fennells filed an affidavit signed by an infectious disease expert who opined that proper medical treatment was not provided to Mrs. Fennell by employees of the Hospital. *Id.* at 780. He further opined that if decedent had been diagnosed and treated in accordance with the appropriate standard of care, she would have had a 40% chance of survival. *Id*. In the expert's opinion, the violation of the standard of care by the Hospital's employees allowed the meningitis to progress and became irreversible. *Id*. In the words of the *Fennell* Court, "[i]n effect, [the plaintiffs' expert] established that decedent had a 40% chance of surviving the meningitis, but that the chance was lost as a result of the Hospital's negligence." *Id*.

The motions judge in *Fennell* entered judgment in favor of the Hospital on both the wrongful death and survival counts. *Id.* at 780. The Fennells appealed, but while the appeal was pending, the Court of Appeals decided *Weimer*; the Fennells immediately recognized that *Weimer* was dispositive of their wrongful death claim, but elected to proceed with their

28

appeal, claiming that the motions judge had erred in granting summary judgment as to the survival claim. *Id*. at 780-81. The personal representative contended that "the Maryland courts have left open the issue of whether loss of chance is compensable in a survival action where the degree of proof that death was caused by negligence does not meet the 'more likely than not standard.'" *Id*. at 781.

It is important to note that in *Fennell*, the Court did not hold that to prevail in a survival action, the personal representative must prove that the defendant's negligence caused the death. Instead, the issue presented was "whether ordinary survival action damages should be <u>expanded</u> in loss of chance cases." *Id*. at 792 (emphasis added).[9]

Even though the *Fennell* Court rejected recovery under the loss of chance doctrine, the decision did not, in any way, change the rule that in an ordinary survival action the personal representative is still allowed to recover other damages such as medical expenses, recompense for the decedent's conscious pain and suffering, and lost wages.[10] *Id*.

---

[9] The exact language of the *Fennel* Court was:

> <u>The determination of whether to recognize loss of chance damages should also include a determination of whether ordinary survival action damages should be expanded in loss of chance cases.</u> These issues are more properly resolved by the legislature.

320 Md. at 792 (emphasis added).

[10] In *Fennell*, the information necessary to decide the appeal was set forth in an agreed statement of facts. There is no indication in *Fennell*, that the alleged medical negligence caused Mrs. Fennell to suffer any conscious pain or suffering or extra medical expenses or loss of income. Under those circumstances, it appears that if the personal representative could not recover under the loss of chance doctrine, there would have been no possible recovery.

As already mentioned, the plaintiffs-appellants contended that Dr. Sharma's actions shortened the decedent's life. The case of *Rhone v. Fisher*, 224 Md. 223 (1961), although it does not involve a survivorship action, does set forth principles of law that are relevant here. The plaintiff, Rhone, was injured when he was struck by an automobile owned and operated by the defendant, Fisher. *Id*. at 224. Three days after the accident, Rhone suffered a heart attack that he claimed: 1) destroyed part of his heart muscle; 2) was caused by the automobile accident; and 3) shortened his life expectancy. *Id*. at 224-25. At trial, Rhone introduced testimony of a heart specialist who opined that it was highly probable that there was a causal connection between the trauma due to the car accident and the heart attack. *Id*. Rhone claimed that the aforementioned evidence was sufficient to show that the injury (heart damage) had "shortened his life expectancy." *Id*. at 225. After Rhone was awarded only $1,500 damages by the jury, he filed an appeal in which he contended that the "trial [judge] should have instructed the jury that [he] was entitled to recover damages for any shortening of his life expectancy due to an injury sustained as a result of the negligence of the defendant." *Id*. at 226. The *Rhone* Court held that "the trial [judge] was correct in refusing to instruct the jury that damages should be allowed for the shortening of the plaintiff's life (if the jury should find that the defendant's negligence caused such shortening)." *Id*. at 230. In reaching that decision, the Court found support from Maryland cases dealing with survivorship actions. *Id*. at 229-30. The Court noted that damages in survivorship actions, apart from funeral expenses, "have, we believe, customarily covered compensation for the pain and suffering endured by the deceased, his loss of time and his expenses between the time of his injury and the [time of] his death." *Id*. (quoting section

30

112 of Article 93 of the Maryland Code, 1957 ed., which is the predecessor of CJP article § 6-401.)

The *Rhone* Court indicated that under the instructions that were actually given, Rhone would be entitled to recover for "any mental anguish which he may have suffered through knowledge or contemplation of the shortening of his life." *Id*. at 232. That language, as applied to the case *sub judice*, would allow Mrs. Wadsworth's personal representative to seek an award of damages if he could prove: 1) that Dr. Sharma's negligence shortened the decedent's life, 2) that Mrs. Wadsworth knew that Dr. Sharma's negligence had shortened her life; and, 3) Mrs. Wadsworth suffered mental anguish as a result of such knowledge. But the *Rhone* Court also made clear that Rhone was not entitled to recover damages for the years of his life that he would have in the future if the defendants-appellees had not been negligent. In this regard, the *Rhone* Court, 224 Md. at 231, quoted 4 Sutherland, *Damages* (4th ed. 1916), § 1241, page 4655:

> If the condition of a person injured is such that a shortening of life may be apprehended this may be considered in determining the extent of the injury, the consequent disability to earn a living, and the bodily and mental suffering which will result. <u>But damages cannot be recovered for the loss or shortening of life</u>. 'The value of human life cannot, as adjudged by the common law, be measured in money. It is besides inconceivable that one could thus be compensated for the loss or shortening of his own life.'

(Emphasis added.)

In the case *sub judice*, as mentioned earlier, the personal representative, in his motion for reconsideration, argued that the jury could award damages for "two and a half years of life, time, and precious moments [that] were unnecessarily taken from Stephanie Wadsworth." That was just another way of saying that the personal representative was

31

seeking damages for Mrs. Wadsworth's "lost years," which, as *Rhone* teaches, is not compensable.

The case of *Monias v. Endal*, 330 Md. 274 (1993), concerned a suit by Glenna Endal and her husband against a gynecologist whose negligence was alleged to have resulted in the probability that Mrs. Endal would die prematurely. *Id*. at 277. More specifically, according to experts called by the plaintiffs, if there had been no negligence, Mrs. Endal would have had an 85 to 90% chance that her cancer would have been cured. But because of the negligence, Mrs. Endal's chance of survival beyond November 1992 was only 20%. *Id*.

The jury awarded Mrs. Endal $33,000 for future loss of income up to the statistically expected date of her premature death, which had an 80% probability of being no later than November 1992. *Id*. at 279. The jury also awarded $250,000 for loss of income after November 1992. *Id*. That $250,000 award was based on testimony that Mrs. Endal, who was 34 years old when the cancer should have been discovered would have worked until she was 65 years old. In other words, the jury awarded Mrs. Endal damages for loss of future earnings "post premature death." *Id*. Dr. Monias contended that the "$250,000 'post premature death' award" was improper and was, in effect, a wrongful death award in a personal injury action. *Id*.

In addressing that issue, Judge Chasanow, who was the author of *Fennell*, commenced the opinion by pointing out that "we are dealing with loss of earnings recoverable in a personal injury action. We are not concerned with loss of earnings in a survival action." *Id*. at 279 n.2. The Court affirmed the $250,000 judgment and held that

32

in a personal injury action, "[d]amages for future loss of earnings must be based on the victim's life expectancy absent the tort rather than on the shortened life expectancy resulting from the tort." *Id*. at 282.

In *Monias*, the plaintiffs, Mr. and Mrs. Endal, also asked the court, in essence, "to recognize an additional category [of damages] — loss of services that the tort victim will not be able to provide to her family because of her shortened life expectancy." *Id.* at 284. The Court said that such damages were <u>not</u> recoverable in a survival action or in a personal injury action brought before death. *Id*.

In *Jones v. Flood*, 351 Md. 120, 124 (1998), the personal representative argued that the lost wages rule enunciated in *Monias*, applied to a survival action. *Id*. In *Jones*, the issue presented was "whether the personal representative of a decedent, whose death was tortiously caused, may recover damages in a survival action measured by lost earnings for the period after death to the end of the statistical life expectancy that would have been predicted for the decedent if the tort had not occurred." *Id*. at 121. The *Jones* Court gave a negative answer, holding, in relevant part: "If the injured person lives for some period following the injury but dies before judgment, lost earnings in the survival action are measured only by the period from the inception of the loss of earnings to death. If, as here, the injured person is killed instantly, there are no future lost earnings damages in the survival action." *Id*. at 131.

In the subject case, Mrs. Wadsworth's employment status was not mentioned at all in the plaintiffs-appellants' written opposition to the summary judgment motion or in their oral argument in the circuit court, nor was that subject mentioned in the briefs filed in this

appeal. At oral argument before this panel, plaintiffs-appellants' counsel was asked by a panel member if Mrs. Wadsworth was employed prior to her death. Counsel answered in the affirmative, but we have been provided with no details as to exactly when she was employed in relation to her death. Nevertheless, because in a situation like this, we are only allowed to affirm the grant of summary judgment on the grounds relied upon by the motions judge (*Cheney v. Bell National Life Ins. Co.*, 315 Md. 761 (1989)) and because the personal representative did claim lost wages in his complaint, we shall remand this case to the Circuit Court for Baltimore County where the personal representative, if he can show that the claim was not waived, will have an opportunity to attempt to prove lost wages. That claim will be limited to the loss of wages caused by the misdiagnosis between February 2016 (when stage IV cancer was diagnosed) and the date of death.

The same is true for the claim in the complaint that Mrs. Wadsworth incurred medical expenses and endured pain and suffering due to Dr. Sharma's negligence. It is possible, based on Dr. Schneider's testimony, that the personal representative will not be able to prove that Dr. Sharma's failure to diagnose the cancer caused the decedent to endure any pain and suffering or medical expenses. *See supra* pages 6-7. But that inability was not the grounds upon which summary judgment was granted. Therefore, if on remand the personal representative can prove that due to Dr. Sharma's negligence, the decedent incurred medical expenses or endured pain or suffering that she would not have endured if there had been no negligence, he can make a recovery for such damages. *See Stewart*, *supra*, 104 Md. at 343 and *Jones*, *supra*, 351 Md. at 126.

34

## IV.

### *Summary as to Survivorship Count*

We will reverse the grant of summary judgment as to the survivorship count and remand the case to the Circuit Court for Baltimore County as to that count only. The personal representative may not recover funeral expenses because under the wording of Estates and Trusts Article, § 7-401(y)(i)(ii), and the holding in *Fennell*, he cannot prove that Dr. Sharma caused the decedent's death. The personal representative, on remand, can recover damages if he can show any of the following: 1) Mrs. Wadsworth endured conscious pain and suffering due to Dr. Sharma's negligence; 2) the loss of wage issue was not waived and that due to Dr. Sharma's negligence, Mrs. Wadsworth suffered pre-death loss of income; and 3) assuming the personal representative can prove that the decedent's life was shorter due to Dr. Sharma's negligence and assuming further that, prior to her death, Mrs. Wadsworth knew Dr. Sharma had shortened her life expectancy, recovery may be had for the mental anguish caused to Mrs. Wadsworth as a result of such knowledge. The personal representative may not, however, recover for the shortening of Mrs. Wadsworth's life.[11] *Rhone*, 224 Md. at 231.

---

[11] In remanding this case, we are cognizant of the fact that in the circuit court, plaintiffs-appellants' counsel never made any meaningful attempt to distinguish between damages recoverable under the wrongful death act and those that may be recovered under the survival statute. The cases that we have discussed involving shortened life expectancy (*Rhone*, *Monias, and Jones*) were never brought to the attention of the motions judge. But the plaintiffs-appellants did argue below, in regard to both the wrongful death claim and the survival action that they were not required to prove that Dr. Sharma's negligence caused the decedent's death. Thus, all the issues discussed in this opinion concerning the survival count were preserved for appellate review.

# V.

## *Other Matters*

In their brief, the defendants-appellees raise a procedural matter that must be addressed. They argued that this Court should dismiss this appeal because plaintiffs-appellants noted their appeal before the entry of the judgment from which the appeal was taken. The aforementioned motion was filed pursuant to Md. Rule 8-602(b)(1) ("The Court shall dismiss an appeal if the appeal is not allowed by these Rules or other law[.]")

The relevant facts concerning this motion are not complicated. Two motions for summary judgment were filed on September 9, 2019. One of the summary judgment motions was filed on behalf of the University of Maryland Community Medical Group, Inc. ("UMCMG"). That motion was filed on the grounds, among others, that it was undisputed that Dr. Sharma was never employed by UMCMG, but rather was employed by co-defendant, the University of Maryland Oncology Associates, P.A. ("UMOA"), at the time of the events at issue. A separate motion for summary judgment was also filed on behalf of Dr. Sharma, UMOA and UMCMG, on the grounds that plaintiffs-appellants could not prove the necessary elements for either a wrongful death or a survivorship action.

On October 7, 2019, at the motions hearing, the judge ruled first on UMCMG's motion for summary judgment. In that regard, counsel for plaintiffs-appellants told the motions judge that his clients did not oppose the motion. Therefore, the court granted that motion. After hearing argument, the motions judge granted the motion for summary judgment filed by Dr. Sharma and UMOA on the substantive grounds that the plaintiffs-

36

appellants could not prove either a wrongful death action or a survivorship action because they could not prove that Dr. Sharma's negligence caused the decedent's death.

The motions judge signed a written order dated October 7, 2019 granting summary judgment in favor of Dr. Sharma, UMOA, and UMCMG and against all the plaintiffs-appellants. This last-mentioned order is the order upon which plaintiffs-appellants' appeal is based.

Maryland Rule 8-202(f) states that entry of judgment "occurs on the day when the clerk of the lower court enters a record on the docket of the electronic case management system used by that court." The separate order, signed by the motions judge on October 7, 2019, had not been entered on the docket of the electronic case management system for Baltimore County on October 28, 2020 when plaintiffs-appellants filed their appeal. But on June 15, 2021, while this appeal was pending, the clerk did enter a final order in accordance with Md. Rule 8-202(f).

Maryland Rule 8-602(f) provides:

(f) Judgment Entered after Notice Filed. A notice of appeal filed after the announcement or signing by the trial court of a ruling, decision, order, or judgment but before entry of the ruling, decision, order, or judgment on the docket shall be treated as filed on the same day as, but after, the entry on the docket.

Based on the aforegoing saving provision set forth in Md. Rule 8-602(f), plaintiffs-appellants' appeal was timely. We shall therefore deny defendants-appellees' motion to dismiss this appeal.

Defendants-appellees also asked us to dismiss the appeal by plaintiffs-appellants against UMCMG because in neither the circuit court nor in this Court did the plaintiffs-

37

appellants contend that the court erred in granting summary judgment in favor of that defendant. At oral argument, plaintiffs-appellants agreed that we should dismiss the appeal against UMCMG. Accordingly, we shall do so.

> **APPEAL FILED BY PLAINTIFFS-APPELLANTS AGAINST UNIVERSITY OF MARYLAND COMMUNITY MEDICAL GROUP, INC. DISMISSED; DEFENDANTS-APPELLEES' MOTION TO DISMISS APPEAL AS TO REMAINING DEFENDANTS-APPELLEES DENIED; JUDGMENT ENTERED IN FAVOR OF POORNIMA SHARMA, M.D. AND UNIVERSITY OF MARYLAND ONCOLOGY ASSOCIATES, P.A. AS TO THE WRONGFUL DEATH CLAIM SET FORTH IN COUNT II OF THE FIRST AMENDED COMPLAINT AFFIRMED; JUDGMENT ENTERED IN FAVOR OF POORNIMA SHARMA, MD AND UNIVERSITY OF MARYLAND ONCOLOGY ASSOCIATES, P.A. AS TO THE SURVIVORSHIP CLAIM SET FORTH IN COUNT I OF THE FIRST AMENDED COMPLAINT REVERSED AND CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THE VIEWS EXPRESSED IN THIS OPINION; COSTS TO BE PAID 50% BY PLAINTIFFS-APPELLANTS AND 50% BY POORNIMA SHARMA AND UNIVERSITY OF MARYLAND ONCOLOGY ASSOCIATES, P.A.**